IN

# THE SUPREME COURT

OF

## THE STATE OF MISSOURI,

JULY TERM, 1857, AT JEFFERSON CITY.

———————

### NEWBY, Appellant, v. PLATTE COUNTY, Respondent.[*]

1. The state, by virtue of its eminent domain, has the right to take private property for public use.
2. The state can rightfully exercise this right only in cases of public necessity, and then only upon paying the owner a just compensation.
3. It is competent for the legislature to provide that, in determining the just compensation to which the owner of property appropriated to public use is entitled under the constitution, the benefits and advantages accruing to such owner in respect of the residue of his property unappropriated, in consequence of the use to which the part taken is applied, shall be taken into consideration. (SCOTT, J., dissenting.)
4. This right of providing that benefits and advantages shall be taken into consideration in determining the just compensation required by the constitution is based upon the general taxing power.
5. Such a provision is in effect an assessment or tax on benefits; being such, and not a tax on property, properly speaking, it is not in conflict with the provision of the constitution requiring that all property subject to taxation shall be taxed in proportion to its value.

---

[*] This case and that of Walther v. Warner et al., immediately succeeding, were decided at the January term, 1857, of the Supreme Court. The opinions of the court were not however filed until after the close of the July term.— [REP.

6. The seventeenth section of article 2 of the general act of 1845, "for open-ing and repairing public roads and highways," (R. C. 1845, p. 974,) pro-viding that in assessing the damages sustained by a person by reason of a road's passing over his land "the commissioners shall take into considera-tion the advantages as well as the disadvantages of the road to such person," is in harmony with the constitution.

7. The benefits to be charged against the adjacent land owners are, it seems, the direct and peculiar benefits resulting to them in particular, and not the general benefit accruing to them in common with other land owners from the building of the road.

*Appeal from Platte Circuit Court.*

*P. R. Hayden*, for appellant.

I. Newby was entitled in damages to the full value of his land appropriated and taken for the road, and the court in the assessment thereof had no right to take into consideration the probable or *incidental advantages* which might or should accrue to Newby from the road in its enhancement of the value of his adjacent lands. (See Constitution of Missouri, article 13, section 7; 5 Dana, 32; 7 Dana, 87; 9 Dana, 114.)

LEONARD, Judge, delivered the opinion of the court.

A great diversity of opinion has prevailed among specula-tive writers as to the origin of private property. The an-cients, it is said, generally held property to be the gift of the Deity, but the nations of modern Europe have regarded it as an institution of the positive law. It would seem, indeed, to be a necessity of our nature, and precedes the establishment of civil government. Man can not live without it, and ac-cordingly rights of property have always existed in every country. In every form of society there are circumstances under which things constituting the necessaries and comforts of life are held to belong to a man so as to be his property. Indeed, one of the main purposes for which civil government exists among men, is the protection of private property; and in providing this protection the civil law must necessarily ascertain and define the things that may be the objects of

ownership, and prescribe and limit the powers of the owner over them.

In this manner and to this extent property may justly enough be considered an institution of the civil law; but when it is thus established by the municipal law, the legitimate authority of the civil government over it would seem to be confined to a just control over the owner in respect to the use he may make of it—to the requiring of contributions from it to meet the public burdens, and to the taking of it for the public use when required for that purpose; and such seems to be the opinion of the writers on public law. Puffendorf, treating of the power of the state over private property, says: " It may, I think, be properly enough reduced to three general heads: first, the right of making laws to direct the proportion in the use and consumption of certain goods; (sumptuary laws — laws against prodigality, &c.); secondly, the right of levying taxes; and thirdly, to the exercise of the transcendental propriety;" (book 8, chap. 5, § 3;) and the practice of all civilized nations has, in good times, always conformed to this.

As to the eminent domain, the " transcendental propriety," as it is here called, all writers on public law agree that the state can not rightfully exercise it except in cases of public necessity, and then only upon yielding the owner a just compensation. Grotius tells us that " the property of subjects is under the eminent domain of the state, so that the state, or he who acts for it, may use and even alienate and destroy such property, not only in cases of extreme necessity—in which even private persons have a right over the property of others— but for the ends of public utility; to which ends those that founded civil society must be supposed to have intended that private ends should give away; but it is to be added that when this is done, the state is bound to make good the loss to those who lose their property." (De jure Belli et Pacis, Lib. 3, chap. 20, Whewell's ed.) Puffendorf, too, speaking of the extent of the right of eminent domain, observes: " It is agreeable to natural equity that when contributions are to

be made for the preservation of a particular thing by such as enjoy it in common, that every man should only pay his quota, and that one should not be forced to bear more of the burthen than another, and the same holds in commonwealths; but because the state of the commonwealth may often be such that either some pressing necessity will not give leave that every particular subject's share should be collected, or else that the public may have necessary occasion to make use of something in the possession of one or more of the private subjects, the sovereign power may seize upon it for the necessities of the commonwealth; but, then, *all that was above the proportion that was due from the proprietors must be refunded to them by the rest of the subjects*" (book 8, chap. 3); and the doctrine and practice of all civilized nations correspond with what is thus laid down by these writers.

No principle in English jurisprudence is better settled than that an individual can not be deprived of his property except for the public use and for a just compensation, and the British parliament accordingly never authorized one individual's property to be taken for the private benefit of another upon any terms, nor for the public use, without first providing a just equivalent for the owner. (1 Black. Com. 139.) The emphatic declaration of the French law (Civil Code, art. 545) is that "no one can be compelled to give up his property except for the public use and for a just and previous indemnity." And an anecdote related by De Tott, in his Memoirs of the Turkish Government, shows that the same principle is equally respected in that despotic government. The Sultan Mustapha, being desirous of building and endowing a new mosque, fixed upon a spot in the city of Constantinople which belonged to a number of individuals, and treated with them for the purchase of their parts. They all complied with his wishes except a Jew, who owned a small house on the place, and refused to part with it for any price. The Sultan consulted his Mufti, and they answered that private property was sacred, and that the laws of the Prophet forbade his taking it absolutely, but that he might

compel the Jew to lease it to him as long as he pleased at a *full rent*. The Sultan submitted to the law.

But in Europe this principle is, in reference to the action of the government, a mere moral rule, imposing no legal restrictions upon the legislative authority; while the American people, by incorporating it into their constitution, and making it a rule of constitutional law, of superior obligations to the enactments of the legislative department, have placed private property under judicial protection, against all efforts on the part of the government to take it from the owner, except under the circumstances and upon the terms recognized as just and proper by the general sense of mankind and the uniform practice of civilized nations; and they have thus given to private property a security altogether unknown to the legal systems of Europe. Our constitutional provision, it is true, does not, like the declaration of the French law, prohibit in express terms the taking of private property in any case except for the use of the public, so as directly to deny to the legisture the power of transferring property from one person to another for any mere private purpose; yet all this is sufficiently implied; and accordingly, in the construction of the provision, it is always assumed that there must be not merely a just compensation, but that the use to which the property taken is to be applied must be a public use in order to authorize the exercise of the power. The questions, therefore, that have been discussed in the courts in the construction of this clause—which is to be found in almost every American constitution—are, what is a public use within the meaning of this provision? and, what is the just compensation required by the constitution? Must it be the whole money value of the property without any deduction? or, is it competent for the legislature to provide that the increased value imparted to the residue of the party's land, by the use to which the part taken is applied, shall be deducted from the compensation to be paid? And the last is the question involved in the present case.

The 17th section of the 2d article of the general road law

of 1845, (R. C. 1846, p. 974,) provides that, in assessing the land owner's damages, the commissioners " shall take into consideration the advantages as well as the disadvantages of the road to such persons." The present road was authorized to be established as a state road by the special act of the 7th February, 1849, and the proceedings for this purpose are directed to be according to the general road law of 1845, and the amendatory act of the 25th of January, 1847. On an appeal from the county court, the plaintiff's damages as a land owner were assessed in the circuit court by the court in lieu of a jury, on an agreed statement of the facts, and the circuit court, when applied to for that purpose, refused to declare that the plaintiff " was entitled to the value of the land taken for the road, and that the advantages of the road to him could not be set off against his claim for the value of the land," and decided that the plaintiff was not entitled to any money compensation for the land taken for the public use ; and thus the validity of the statute provision to which we have referred is submitted to our judgment by the present proceedings. If the state government possessed no authority over private property except that of taking it for the public use upon rendering the owner a just compensation, it would seem that, under this provision, the owner would be entitled to the full money value of his property without any deduction. The rule of constitutional law being that private property can not be taken for public use, by the authority of the legislature, without a just compensation, it follows that what is to be considered as compensation within the meaning of the clause is a question of law for the courts, and not a matter for the legislature ; and, under such a constitution as we have supposed, with no other power over private property than that of taking it for the public use upon making the owner a just compensation, it would be quite beyond the scope of the legislative authority to declare that the benefit derived by the land owner from the road is the just compensation secured by the constitution. If the provision were that the owner should be indemnified against the act complained of,

it might be insisted, that, in ascertaining the extent of the damages sustained, the advantages as well as the disadvantages resulting from the act must be taken into consideration; and this seems to be the view taken of the subject by the Supreme Court of Ohio, in Simonds and others against Cincinnati, (14 Ohio, 174,) under the constitution of that state, which expressly requires the compensation to be made in " money." But that is not the language nor the scope of the provision. The declaration of the constitution is, that no private property ought to be taken or applied to public use without a just compensation; and this would seem to imply that the party should receive the value of his property in money. The transaction is a forced sale to the public, and the constitution in this provision secures to the owner the just price of his property as the only condition upon which he can be lawfully deprived of it.

The government, however, possesses other powers over private property besides the right of eminent domain; and if, in the exercise of the taxing power, the government may lawfully require the adjacent land owners to contribute towards paying for the right of way in proportion to the benefit each will derive from the road, the present enactment, so far as it directs the advantages of the road to be deducted from the price of the land, must perhaps be considered as an exercise of the taxing power. This law is, indeed, nothing more in effect than the exercise of both powers of government in the same breath—that of taking the land by the right of eminent domain, and of requiring, under the taxing power, the adjacent land owners to contribute to the cost of it in proportion to the benefit each will derive from the road. We have an instance of express legislation of this character in the St. Louis charter amendment act of the 23d of February, 1853, where it is provided that when it shall become necessary, in order to improve any street, &c., to take private property, the jury shall first ascertain *the value of all the ground* proposed to be taken, and then assess against the city, for the payment of this debt, a sum equal to the value of the improvement to the

Newby v. Platte County.

general public; and the balance of the money necessary to pay for the ground they shall assess against the owners of the lots fronting on the street according to the value of their lots, and in the proportion that they will be respectively benefited by the improvement. Under this act, and the ordinance passed to carry it into execution, when the whole lot is taken, the owner receives the whole value of it in money; but when part only is taken, the value of the part taken and the amount of benefit the owner will derive from the improvement of the street in respect to the residue of his lot are assessed separately, and one being set off against the other, the owner receives or pays the balance as it turns out to be for or against him. Under the St. Louis act, the city pays towards the cost of the ground a sum equal to the value of the improvement to the city generally, and the residue of the cost is apportioned among the adjacent lot owners in proportion to the benefit derived respectively from the improvement. Under the provisions of the general road law, the adjacent land owners pay towards the cost of the right of way the value of the improvement to themselves—not exceeding however the value of the land taken from them respectively—leaving the balance of the cost to be paid by the county. Under the St. Louis act, the sums to be paid by and to the adjacent lot owners are assessed separately, and when part only of a proprietor's lot is taken, one amount is set off against the other, and the balance only is settled in money. Under the road law, the benefit is in every case deducted from the value of the land taken, and the balance only is formally ascertained and declared; thus what is formally gone through with under the St. Louis act, step by step, is done, substantially at one blow under the road law. In both cases the legislature exercises the same power over private property, and no other; and although in one case the language employed has a more direct reference to the taxing power than in the other, we are not at liberty, we think, on that account to treat the provision in one act as a prohibited invasion of private property, and to give effect to it in the other as an

exercise of a lawful power. If the legislature may, under the taxing power, lawfully require the contribution, and if this provision in the road law be substantially such a requisition, as we think it is, we are not at liberty to treat it as a nullity, but must give effect to it accordingly. In a case now before us at St. Louis, (Garrett v. St. Louis,) under the St. Louis act before referred to, part of the plaintiff's lot was taken for the improvement of Main street, and he insists upon being paid the whole assessed value of the part taken, without any deduction on account of the assessment against him for benefits in respect to the residue of his ground; and the question there is as to the validity of what is in that case express taxation for a local object—while in the present case it is as to the validity of what is in effect, though not in words, a like assessment for a like purpose.

In both cases the only question, as it appears to us, is as to the competency of the legislature to require the adjacent land owners to contribute towards the cost of the ground for a road or street, in proportion to the benefit; or, to state the proposition in more general terms, it is as to the constitutional validity of taxes imposed by a subordinate authority in the state upon an arbitrary district of country in proportion not to the value of the property, but to the benefit to be derived by the owner from the improvement.

Upon this question we begin by remarking that the power of taxation, as well as the more subordinate power of taking private property for the use of the public, without any reference to the owner's duty to contribute to a common burden, exist and are exercised of necessity in every nation as legitimate powers of civil government, and appertain to our state government as part of the legislative power, without any express grant for that purpose. The right of eminent domain is, in its nature, capable of being limited and regulated in some degree by general rules, and has accordingly, as we have already remarked, been confined in all civilized states by the practice of government, and in our American republics by express constitutional provision, to cases of public

necessity and convenience, on the payment to the owner of a
just compensation. But the power of taxation is more inde-
finite in its character, and less capable of limitation by gene-
ral rules of law.—the amount of money to be raised, and to
what purpose it shall be applied, and the persons and things
that shall contribute to it and according to what rule of ap-
portionment, are all matters left almost of necessity to the
discretion of the legislative department—the only express
limitations in our constitution upon the taxing power being
that " all property subject to taxation shall be taxed in pro-
portion to its value," and the prohibition against taxing the
lands of non-residents higher than residents' lands.

The validity of the enactment now under consideration,
considered as an exercise of the taxing power, is not question-
ed upon the ground of its being a local tax. There are every-
where, in all civilized states, two sorts of public expendi-
tures—those that concern the whole state in general, and
those that are confined to its civil sub-divisions and lesser
localities, and both justice and convenience require, and have
accordingly introduced into the practice of all governments,
corresponding general and local taxation. (Domat, Pub. Law
Book, 1, tit. 5, secs. 1 and 5.) Our own practice, correspond
ing with the general practice of the other states, has been to
meet the general burdens by general taxation, and to make it
the duty of the local authorities to raise and expend within
their respective limits, under such restrictions as the legisla-
ture should deem proper, the taxes applicable to the local
public service. The manifest equity and convenience of
these local assessments, for the accomplishment of local pur-
poses, has brought them more and more into general use,
confining them, in very many instances, to very small locali-
ties; and no one now questions their validity, although at an
early day the constitutional validity of taxation levied by
subordinate tribunals was questioned, on the ground that it
was levied without the consent of the people or their repre-
sentatives; or, in other words, that it was an exercise of the
legislative power of taxation which it was not competent for

the legislature to delegate to others. (County Levy Case, 5 Call, 139.) That objection, however, was overruled in the case in which it was made, and has never been regarded in American legislation.

The objections that have since been relied upon to these local assessments for local improvements are that it is not "legitimate taxation," and that in this state, under our constitution, they are not valid as taxes, because they are apportioned according to the benefit and not according to the value of the property as required by the constitution. The position assumed is that "legitimate taxation is limited to the imposing of burdens or charges for a public purpose equally upon the persons or property within a district known and recognized by law as possessing a local sovereignty for certain purposes, as a state, county, city, town, village, &c.;" and consequently road and street and other similar assessments for local improvements are no other than the taking of private property, under color of the taxing power, without providing the compensation required by the constitution. This idea, it is believed, was first formally announced in New York, in the case of The People v. Mayor of Brooklyn, 6 Barb. 216, and is said to have originated in the court of appeals of Kentucky, in the case of Sutton's heirs v. City of Louisville. (5 Dana, 28.) The New York case was an assessment on a lot owner in proportion to the benefit for the purpose of building a sewer, and the Kentucky case was a similar assessment for the extension of a street, and both assessments were decided to be unconstitutional, as not being legitimate exercises of the taxing power. The New York case, however, was reversed on appeal, in the court of appeals; (4 Comst. 428;) and the doctrine itself seems to have been subsequently abandoned in effect in Kentucky, in the case of the City of Lexington v. McMillain's heirs, 9 Dana, 513, by the same court, composed of the same judges, in which it originated. In the latter case, Lexington was authorized by its charter to cause the streets to be paved at the expense of the lot owners in each square, either upon the

application of the greater part of them, or without such application by the unanimous consent of the mayor and council; and one question being as to the validity of an assessment that had been made pursuant to an ordinance passed with the required unanimity, the court held it valid, suggesting that *each square might be considered an independent municipality for this purpose.* Upon principle, there is nothing, we think, in the objection.

In distinguishing taxation from the taking of private property under the right of eminent domain, it has been well observed that taxation exacts property from individuals as their respective shares of contribution to a public burden. Private property taken by the right of eminent domain is not taken as the owner's share of such a contribution, but as so much beyond it. Taxation operates upon a class of persons or things, and by some rule of apportionment. The exercise of the right of eminent domain operates upon individual persons or things, and without any reference to what is exacted from others. The present tax, if we may consider it as one, operates upon a class of persons—the owners of the several tracts of land over which the road passes—is assessed against them in proportion to the benefit each derives from the improvement, and is exacted from them as their respective shares of contribution to the establishment of the road. We may remark, too, that taxation of this character has prevailed too long and too extensively to be treated as illegitimate, or denounced as legislative spoliation under the guise of the taxing power. It prevailed in England several centuries ago ; and the assessments made there by the commissioners of sewers on the lands affected by their operations was taxation of this character. (28 Hen. VIII, chap. 5, sec. 5.) In Massachusetts, from an early period, meadows, swamps and lowlands were required to be assessed among the proprietors to pay the expense of draining them, (Rev. Stat. of Mass. p. 673,) and in Connecticut the same power was given to commissioners for draining marshy lands. (Conn. Stat. ed. 1839, p. 544.) It is said by the judge, who delivered the

opinion of the court of appeals in the Brooklyn case before
referred to, that the system of local taxation for local im-
provements, by assessing the burden according to the benefit,
had prevailed for more than one hundred and fifty years, and
that this power was given to the corporation of New York in
1691, and had since been conferred on nearly every city and
on many of the villages of the state. We are informed in the
opinion of the Supreme Court of Kentucky, in the Lexington
case before referred to, that the assessment of benefits for the
improvement of streets had been sanctioned as constitutional
in Louisiana, South Carolina, and Pennsylvania; had been
virtually recognized by the courts in New York and Massa-
chusetts, and had never been declared unconstitutional by
any court, so far as they had been able to ascertain; and we
may ourselves remark that similar taxation is authorized by
law in New Jersey, Maryland, Virginia, Ohio and Indiana,
and either acquiesced in by these communities or adjudged
valid by their courts. Finally, the *validity of local* assess-
ments of this character was considered and affirmed in this
court at our last St. Louis fall term, in the case of Lockwood
v. The City of St. Louis, 24 Mo. 20, where the assessment was
to construct a common sewer, and was levied on all the lots
in an arbitrary district—laid off by the corporation for the
purpose of constructing the sewer.

The only difference between that and the present case, if
we may look on the provision of law we are now considering
as an exertion of the taxing power, is, that there the assess-
ment was in proportion to the *value of the lot;* here, it is in
proportion to the *benefit to accrue to the owner of the ground.*
That case, therefore, does not touch the objection that the
present assessment is invalid as a tax by reason of our consti-
tutional provision requiring all property subject to taxation
to be taxed according to its value. This, as we have already
remarked, is one of the two express limitations to be found in
our constitution upon the taxing power, and was the subject
of a good deal of discussion in the case of Crow v. The State,
14 Mo. 237. Whether the effect of the provision be to re-

quire the legislature, in.laying a property tax, to tax *all the property in the state* subject to state taxation, without omitting any, or whether it only requires them to tax, *without discrimination, all the objects of property that they may select for taxation*, or whether the clause is satisfied by *taxation levied according to the value of the taxed property* and not arbitrarily at specific sums fixed by the legislature, as the judges in the case referred to seem to have respectively thought, we need not stop to inquire—the question before us being whether an assessment of this character is a property tax within the meaning of this constitutional provision.   A system of taxation framed exclusively with a view to a just distribution of the burdens of government among its citizens would require that each should contribute in proportion to the benefit he received.   But as the amount of benefit each derives from the general expenditures of the government can not be ascertained with any reasonable certainty, *the benefit received* can not be adopted as a standard for the apportionment of general taxation.   The rich however derive more benefit from the  government in the  protection  and improvement of their property, and therefore a tax against a person in proportion to his property, levied not arbitrarily but according to its value, apportions the burden according to the benefit more nearly than any other rule of general taxation, and is therefore adopted as the most equitable tax to defray the general expenses of the state.   In local taxation, however, for local objects, the personal benefit to each, it is supposed, may be seen and estimated with a reasonable degree of certainty, and therefore, in such assessments, it is deemed fairer that each should contribute in proportion to the benefit.

Our state revenue is assessed against persons in respect to such of their property as the legislature select for taxation, and in proportion to the value of it; while formerly, under the territorial government, it was levied arbitrarily on property at specific sums, fixed by the legislature (Geyer's Dig. Revenue, secs. 1, 2, 4, 9); and certainly one effect of the constitutional provision under consideration is to forbid the

ancient mode of assessment, and to require the legislature, in the imposition of taxes on persons in respect to their property, to assess them according to the value of the property selected as the objects of taxation, and not at arbitrary, fixed rates prescribed by the legislature. But we can not suppose it was the intention of the people of this state to suppress entirely that large class of assessments, felt to be so just and equitable and which for that reason had been introduced so generally into practice, in which each is required to contribute to the burden in proportion to the benefit he derives from the expenditure. When the taxation is against one in respect to his property as property, when he is assessed for a property tax, the assessment must be according to the value of the taxed property; but here the property is assessed in respect to the benefit he derives from the improvement; it is a tax on the benefits rather than a tax on the property, and therefore is not obnoxious to the constitutional prohibition we are now considering. The result is, it was competent for the legislature, in the exercise of the taxing power, to require the adjacent land owner here to contribute towards the road in proportion to the benefit; and the provision in the general road law, that is complained of as unconstitutional, is in effect an exercise of this authority. And we remark in this connection that there is a marked difference between general taxation and special assessments for local objects, and that the word tax may be used in a contract or in a statute so as not to embrace within its meaning local or special taxes, although both kinds of taxation derive their authority from the general taxing power; and accordingly, although in Lockwood's case, before referred to, we held that church property was not exempt from the special sewer tax authorized by the St. Louis general sewer act, yet it was not suggested or supposed that the assessment was not made under the authority of the general taxing power of the state.

Our conclusion in favor of the validity of the provision under consideration, to which we have thus come by considering the question on principle, is corroborated by the mass

of judicial decisions in the other states on the subject. The American constitutions generally, as already observed, contain the same provision for the protection of private property to be found in our own, and a similar statute provision has been generally adopted throughout the United States in reference to the assessment of the damages for land taken, whether by the public or by private corporations, for public roads and canals, as well as for turnpikes and plank roads and railways; and Virginia, Kentucky and Tennessee are, we believe, the only states in which the provision has been treated by the courts as invalid. (James River and Kanawha Co. v. Turner, 9 Leigh, 315–341; Woodfolk v. The Nashville and Chattanooga Railroad Co. 2 Swan, 422, and Jacobs v. The City of Louisville, 9 Dana, 114.)

In many of the states its constitutional validity has been expressly affirmed by the courts, while in others it has been silently acquiesced in, and we refer to the following authorities for the course of American legislation and judicial decisions upon the subject. In many of these cases the decision is put on the ground that the government is only bound to indemnify the owner against whatever damage may result to him from the application of his property to the public use, which, although different from the ground on which our decision is placed, produces under our existing laws the same practical result in the assessment of the damages. (Mass.—Rev. Stat. chap. 24, sec. 31; Commonwealth v. Combs, 2 Mass. 492; Commonwealth v. Sessions of Middlesex, 9 Mass. 370; Commonwealth v. Norfolk Sessions, 5 Mass. 436. New York—2 Rev. Stat. 412; Livingston v. Mayor of New York, 8 Wend. 80; The People v. Mayor of Brooklyn, 4 Comst. 428. Pennsylvania Railroad Co. v. Heister, 8 Penn. State Rep. 447; McMasters v. The Commonwealth, 3 Watts, 294. Ill.—Alton & Sangamon Railroad Co. v. Carpenter. 14 Ill. 199. Ohio—Symonds v. City of Cincinnati, 14 Ohio, 147. Alabama—Code 1852, p. 257, sec. 1136. 27 Miss. 210. Vermont—Compiled Stat. of 1850, p. 173, sec. 67. Maryland—5 Gill. 388; 1

Mary. 540; 5 Mary. 314. Indiana—The State v. McIntyre, 5 Blackf. 386.)

As to our own legislation, we remark that the first American road law passed here was enacted by the governor and judges of the territory of Louisiana on the 6th of July, 1806, by which it was made the duty of the jury empanelled to assess the damages, to certify to the court their opinion " whether any damage, and, if any, how much damage would accrue to the owner of the ground by the passing of the road through the same." The provision, in substantially the same language, was reënacted in 1814 by the territorial legislature, and has been successively reënacted, in the same language, at every revision of our laws since, down to the present time. At the revision of 1845 a second article in reference to state roads was added to the road law; and the 17th section of that article, expressly requiring the advantages as well as disadvantages to be taken into consideration in the assessment of the damages, is a new provision then for the first time introduced into the revised statutes, and which was then, it would seem, confined to state roads, although in the last revision it has been extended to county roads.

But, although the first article of the act of 1845, in reference to county roads, does not expressly require the advantages as well as the disadvantages to be taken into consideration in the assessment of the damages, yet this seems to be required in effect by confining the compensation to be allowed to the owner to " the damages he may sustain by reason of the road's passing through his land." The road law of the Northwest territory, passed at Cincinnati in 1799, provided that the persons chosen to assess the damages of those through whose land a public road was proposed to be run " should take into their consideration how much less valuable the land would be rendered by reason of the contemplated road and assess the damages accordingly." This provision seems to have continued in force in the territory until the whole country was successively organized into states, and the courts of these states

have put upon the provision in their constitutions, where the question was as to the compensation to be allowed for land taken for roads, the same construction that was given to their ancient road act, which was that it secured to the owner not the price of the property taken but a *recompense for the actual injury sustained*, taking into consideration the advantages as well as the disadvantages to result from the act. (McIntyre v. The State, 5 Black. 386.) Now our act of 1845 in reference to county roads, although not identical in language in this particular with the old territorial law from which it was probably taken, would seem to impose the same injunction in reference to the assessment of damages that is tacitly enjoined in the territorial law and expressly commanded in our act of 1845 in reference to state roads, and in our act of 1855 in reference to all roads both state and county. This, however, we are not now called on to determine, as the 17th section of the second article of the road law of 1845 is applicable to the present proceeding, and the language there used is such as to leave no doubt as to the effect of the law, if the legislature have the constitutional power to require what they have commanded.

But, although we concur with the circuit court in thinking this section of the road law constitutional, yet the judgment must be reversed upon another ground. The only facts agreed between the parties, and upon which the decision was pronounced, were, that the road ran " through the plaintiff's land one hundred and twenty-two poles, and occupied one and one-half acres of ground, worth fifteen dollars per acre ;" but it was not admitted that the road was any benefit to the party, and the court, we think, could not infer this as a matter of law from the agreed facts, and pronounce against allowing the plaintiff any compensation for the property of which he was deprived.

As to the proper rule by which to compute the benefits in cases of this character, it may not be improper, as the case is to be remanded for further proceedings, to remark that the Supreme Court of Massachusetts, in the case of Meacham v.

The Fitzhugh Railroad Co., 4 Cush. 392, declared that the benefits to be charged against the adjacent land owners and deducted from the compensation to be paid to them, were the direct and peculiar benefits that would result to them in particular, and not the general benefit that they would derive in common with other land owners from the building of the road; and this seems to be substantially the principle adopted by our own legislature as just and equitable in the St. Louis street improvement act before referred to, and ought perhaps to be followed in the construction of this provision of the road law. In reference to the disadvantages, it is to be observed that the constitution only secures to the owner the price of his property, but it is competent for the legislature to go beyond this, and not only pay him the value of his property, but also indemnify him against any damage that will result to him from the use to which it is to be applied; and this they have effected by requiring the *disadvantages* as well as the advantages to be taken into consideration in the assessment of the damages. Judge Ryland concurring, the judgment is reversed, and the cause remanded.

Scott, J., dissenting. I dissent from so much of the opinion of the majority of the court as maintains that, in the computation of the damages to be paid to the owner of the property taken for public use, regard must be had to the advantages and disadvantages resulting to such owner from the use to which the property may be applied. The value in cash of the thing taken, considering its place and situation, is the compensation contemplated by the constitution to which the owner, as such, is entitled. The legislature may compensate disadvantages with advantages, but the value of the property taken must be paid for in money.