CRIBBS *v.* BENEDICT.

Opinion delivered December 11, 1897.

CONSTITUTIONAL LAW—DITCHING ACT.—The ditching act (Sand. & H. Dig., § 1203, *et seq.*), which provides, (§ 1205) that all lands benefited by a public ditch or drain shall be assessed in proportion to the benefits, for the construction thereof, whether it passes through said land or not," is not unconstitutional as providing for a taking of private property for public use without just compensation. (Page 558.)

DITCHING ACT—ASSESSMENT OF BENEFITS.—In providing that "all lands benefited by a public ditch shall be assessed in proportion to the benefits," the ditching act contemplates that only those benefits should be estimated which are local and peculiar to the land taken or assessed, and not those which the owner receives in common with the community generally. (Page 559.)

SAME.—The amount which may be assessed against the property to be benefited by a public ditch is limited to an amount within the special benefits to be received. (Page 561.)

CONSTITUTIONAL LAW—TAKING WITHOUT COMPENSATION.—The fact that an act provided for the taking of one's land for a public purpose without providing just compensation would not render it void, but only ineffectual to take the land *in invitum.* (Page 560.)

SAME—DELEGATION OF TAXES.—Local assessments for the purpose of constructing a public ditch are not "taxes," within the meaning of the

constitution of 1874, art. 2, § 23, providing that "the general assembly may delegate the taxing power, with the necessary restrictions, to the state's subordinate political and municipal corporations, to the extent of providing for their existence, maintenance and well being, but no further." (Page 562.)

CONSTITUTIONAL LAW—TAKING WITHOUT DUE PROCESS.—The ditching act, providing for the taking of land necessary for the construction of a public ditch, does not infringe the constitutional prohibition against taking property without due process, since the expression of the legislative will authorizing such taking is of itself due process, and since the act itself provides for notice to interested parties, and points out a remedy to such as may be aggrieved. (Page 562.)

SAME—DISCRIMINATION AGAINST NON-RESIDENTS.—In providing that the ditch tax shall be collected on the lands of a non-resident as other taxes, but that it shall be enforced against the lands of a resident by proceedings in the circuit court, the ditching act does not discriminate against non-residents, nor is it a violation of art. 4, § 2, Const. of the United States, guarantying equal privileges and immunities to citizens in the several states. (Page 563.)

SAME—ACT UNCONSTITUTIONAL IN PART.—If any special provision of an act be unconstitutional, and can be stricken out without affecting the validity of the residue of the act, it will be done, and the remainder of the act allowed to stand. (Page 563.)

DITCHING ACT—DIVERGENCE FROM PETITION.—Where a petition for the establishment of a public ditch in general terms asked that the three several lakes mentioned should be drained "by a ditch running from about west to east," and emptying into the river on the land of D, it was not an unwarranted divergence for the county court to establish a ditch which would drain the three lakes by a shorter and less expensive route running north and south on the divisional lines, although such ditch would not empty into the river on the land of D. (Page 564.)

SAME—NOTICE TO LANDOWNERS.—The notice of the pendency of a petition for the establishment of a public ditch, which the statute (Sand. & H. Dig., § 1208) requires to be given, is designed for the protection of the landowner, and must scrupulously conform to the statute. (Page 569.)

Appeal from Faulkner Chancery Court.

THOMAS B. MARTIN, Chancellor.

*Cockrill & Cockrill* and *J. G. B. Simms*, for appellant.

Compulsory drainage is authorized by statute (Sand. & H. Dig., §§ 1203–1232), and the burden is on appellees to show the omission of any step requisite to the fixing of a valid lien on the land. Sand. & H. Dig., § 6632; 49 Ark. 190. Variation between the location of the ditch as described in the petition and as actually located by the viewers is not fatal to the

jurisdiction of the court to order the ditch dug as located by the viewers, so long as the ditch commences at the point described in the petition and follows the line as near as possible. Sand. & H. Dig., §§ 1204, 1206; 50 Ark. 116; 59 *ib.* 344; 45 N. E. (Ill.) 215. The required notice, on the filing of the viewers' report, was given. Sand. & H. Dig., § 1208. The judgment of the county court establishing the ditch is conclusive of the regularity of all prior proceedings. Sand. & H. Dig., § 1232; 11 Ark. 579; 39 *ib.* 347, 351, 352; 49 Ark. 397; 55 Ark. 30, 36. At least, it is *prima facie* evidence of regularity. 33 Ark. 816; 57 Ark. 136, 140. The notice is not jurisdictional. 47 Ark. 431, 441; *ib.* 139, 142; 34 Ark. 399, 404; 10 Wall. 308; 51 Ark. 516. The act is not unconstitutional for non-conformity to the provisions relative to taxation. 11 Ark. 52; 48 *ib.* 385; 59 Ark. 513. Nor does the act infringe on the Federal constitution. 17 U. S. Sup. Ct. Reporter, 56, 65. Nor does it discriminate against non-resident. Note 2 to § 2, art. 15, Const. U. S., Dig., p. 24; 17 Ark. 422–3. Nor is it void for want of uniformity. 48 Ark. 385; 21 Ark. *sup.;* 25 *ib.* 295. Nor because it deprives a person of property without due process of law. Anderson's Dict. p. 818; Const. '74, art. 2, § 23; 47 Ark. 438; 59 Ark. 512. Doubts are to be resolved in favor of constitutionality of act. 59 Ark. 513. Appellee is estopped to refuse to pay his share of tax. 43 Cent. L. J. 244; 59 Ark. 345; 50 Ark. 132–2. If the tax sale is, for any reason, invalid, appellant has a lien on the land. Sand. & H. Dig., § 6632; 50 Ark. 489.

*P. H. Prince* and *Sam Frauenthal*, for appellees.

The order of the county court establishing the ditching district is void, because the provisions of the statute were not complied with, in that: (1) The petition is not signed by the landowner, but by his attorney. 50 Ark. 483; 59 Ark. 483. (2) There is a difference between the description and course of the ditch, as set out in the petition and as set out in the order of the court. Sand. & H. Dig., § 1206; 59 Ark. 344; 50 Ark. 116. (3) No opportunity was given for appeal or objection, by interested parties, to the order. (4) Due notice of the hearing of the report of the viewers was not given. Sand. &

H. Dig., § 1208.  The act creating the drainage tax is uncon-
stitutional, because:  (1) The taxation is not proportioned to
value.  Const. art. 16, § 5; 32 Ark. 31; 48 Ark. 251.  (2)
There is no discrimination shown.  48 Ark. 382; 62 Ark. 107;
Sand. & H. Dig., § 1220; Const. U. S. art. 2, § 2.  (3) It
takes private property without just compensation.  Art. 2, § 22,
Const. Ark.

WOOD, J.  Appellant purchased certain lands belonging
to appellees at a sale of same for taxes, and received a certifi-
cate of purchase.  Appellees brought suit to set aside the sale,
and cancel the certificate of purchase, alleging, *inter alia,* that
the lands were sold for an illegal ditch tax, which rendered the
sale void.  Appellant concedes that the sale was void, on
account of an illegal fencing tax which was included in the
amount for which the sale was made, but contended that the
ditch tax was legal, and a valid lien upon the land, and he
made his answer a cross-bill, and asked that the ditch tax be
declared a lien on the land, and that same be sold to satisfy
said lien.  The court declared the ditch tax illegal and void,
for the reason "that no petition was filed for the establishment
of said ditch, as required by law, and that the alleged tax or
assessment against said land for said ditch was not uniform or
equal, and was without due process of law," and accordingly
set aside the sale, and cancelled the certificate of purchase.
So the question here is, was the ditch tax legal?  Its solution
involves the constitutionality of the "Ditch Law" and the
legality of the proceedings thereunder of the county court in
causing the construction of a certain ditch.  The law is found
in sections 1203 to 1233 inclusive of Sand. & H. Dig.  Is it
unconstitutional?

First.  It is contended that the act is contrary to art. 2, §
22, of the constitution, which provides that "private property
shall not be taken, etc., for public use, without just compensa-
tion."  The act provides, in § 1205, that "all land benefited by
a public ditch or drain shall be assessed in proportion to the
benefits, for the construction thereof, whether it passes through
said lands or not;" and, in § 1204, that the viewers shall make
"an estimate of the total cost of the whole work; and they shall
set apart and apportion to each parcel of land, etc., a share of

said work in proportion of the benefits which will result to each from improvements," etc.   The constitution contains no limitation upon the consideration of benefits as just compensation for land taken under the power of eminent domain, except when exercised through the instrumentality of a corporation.   Art. 12, § 9, Const. Arkansas.   Reading the above provisions in connection with the constitution requiring compensation, it appears that the land owner is to receive compensation for land taken in benefits.   Would this be just compensation?

As was said by the Supreme Court of Nevada:   "No legislature can diminish by one jot the rotund expression of the constitution" requiring just compensation.   *Virginia & T. R. Co.* v. *Henry*, 8 Nev. 165.   "Just compensation is a fair and full equivalent for the loss sustained by the taking for public use."   Lewis, Em. Dom. § 462, and authorities cited.   The inquiry then is, what financial injury has the individual sustained whose land has been taken for the public use?   For this injury, his indemnity must be real, substantial and full.   Less would be unjust to him; more would be unjust to the public. Where the constitution is silent upon the subject, the decisions of the courts present diverse views upon the right to consider, by way of compensation for a portion of his land taken for public use, the benefits thereby accruing to the remainder. Lewis, Em. Dom. § 465.   The view which seems to us to accord with reason, and which is supported by high authority, is that where the public use for which a portion of a man's land is taken so enhances the value of the remainder as to make it of greater value than the whole was before the taking, the owner in such case has received just compensation in benefits. And the benefits which will be thus considered must be those which are local, peculiar and special to the owner's land, who has been required to yield a portion *pro bono publico.*   Cooley, Const. Lim. pp. 697, 698;   Lewis, Em. Dom. p. 470;   6 Am. & Eng. Enc. Law, 581, "Benefits;"   *Trinity College* v. *Hartford,* 32 Conn. 452;   *Nichols* v. *Bridgport,* 23 Conn. 189;   *Comr's. etc.* v. *O'Sullivan,* 17 Kas. 58;   *Tobie* v. *Comrs. of Brown County,* 20 Kas. 14;   *Roberts* v. *Comrs. of Brown County,* 21 Kas. 247; *Trosper* v. *Comr's. of Saline County,* 27 Kas. 391;   *Simmons* v. *St. Paul & Chicago Ry. Co.,* 18 Minn. 184;   *Arbrush* v. *Oakdale,*

28 Minn. 61; *Cross* v. *Plymouth*, 125 Mass. 557; *Clark* v. *Worcester*, 125 Mass. 226; *Hilbourne* v. *County of Suffolk*, 120 Mass. 393; *Whitney* v. *Boston*, 98 Mass. 312; *Daugherty* v. *Brown*, 91 Mo. 26; *Jackson County* v. *Waldo*, 85 Mo. 637; *Livermore* v. *Jamaica*, 23 Vt. 361; *Newby* v. *Platte County*, 25 Mo. 258.

Judge Cooley says: "In estimating either the injuries or the benefits, those which the owner sustains or receives in common with the community generally, and which are not peculiar to him and connected with his ownership, use, and enjoyment of the particular parcel of land, should be altogether excluded." Cooley, Const. Lim., § 698.

Should it become necessary to take the whole of one's land for the public improvement, or should one whose land is taken derive no benefit to the remainder which is local and special, differentiating him in this respect from the rest of his neighbors, then, in such cases, under this statute, no compensation has been provided, and the act would be inoperative to take without the consent of the owner under the power of eminent domain.

But, if it be conceded that compensation to the land owner is not provided in the act, that fact would not render it void, but only ineffectual to take the land *in invitum*. In *Cairo & Fulton R. Co.* v. *Turner*, 31 Ark. 494, at page 504, this court said: "It has been held that provision for compensation may be in a subsequent law, and that an act taking private property for public use is not void because it does not provide compensation or a mode of ascertaining it, but that its execution will be enjoined until such provision is made, and the compensation paid." See also, *People* v. *Leow*, 39 Hun, 490; S. C. 102 N. Y. 471; *In the matter of Application of Lower Chatham, etc.*, 35 N. J. Law, 497; *Rogers* v. *Bradshaw*, 20 Johns. 735; *Jerome* v. *Ross*, 7 Johns. Ch. 315; *Shute* v. *Chicago & M. R. Co.*, 26 Ill. 436; *Wellington, Petitioner*, 16 Pick. 87; Lewis, Em. Dom. § 452; 6 Am. & Eng. Enc. Law, 563, "Damages." "Where a constitutional provision is designed for the protection solely of the property rights of the citizen, it is competent for him to waive the protection, and to consent to such action as

would be invalid if taken against his will." Cooley, Const. Lim., 214.

Another question affecting the constitutionality of this law is, whether or not the cost of the construction of the work can in any case exceed the improvements. For if the act does not restrict the assessments which may be made for the cost of the construction of the ditch to an amount within the special benfits received, it would, for all the excess, be, *pro tanto*, a taking of private property for public use without compensation. *Tide Water Co.* v. *Coster,* 18 N. J. Eq. 518; S. C. 90 Am. Dec. 634, and cases cited in note; *Hartwell* v. *Armstrong,* 19 Barb. (N. Y.) 166; *Kean* v. *Driggs Draining Co.,* 45 N. J. L. 91; *Lee* v. *Ruggles,* 62 Ill. 427; *Matter of 4th Avenue,* 3 Wend. 452; *State* v. *Mayor, etc., of Newark,* 3 Dutcher, 185; 6 Am. & Eng. Enc. Law, 2, "Drains."

The supreme court of New Jersey, in passing upon the words "in proportion to the benefits," said: They may naturally be construed to mean such portion of the expense as will be according to the benefit received, making the benefit the measure of the portion to be assessed, and the amount not to exceed such benefit." *In Matter of application, etc., of Lower Chatham,* etc., 35 N. J. L. 497–503. These qualifying words, "in proportion to the benefits received," are not used in § 1215, but that section must be read in connection with §§ 1203 and 1205, where they are used, and, taking them altogether, the intention was to limit the assessment for the cost of the location and construction of the ditch, so that it shall not exceed the benefits received therefrom.

The county court is given the power to cause the construction "of any ditch or drain within said county, where the same shall be conducive to the public health or welfare, or where the same will be of public benefit or utility." The power to construct a drain carries with it the power to take the necessary land for that purpose; and, as the express object of the taking is the public weal, we have thus far considered the law as referable to the power of eminent domain, which, according to many authorities, is the proper designation. *Hartwell* v. *Armstrong,* 19 Barb. 166; *Burk* v. *Ayers,* 19 Hun, 17; *In matter of Ryers,* 72 N. Y. 1; *In Matter of Comrs. to Drain the Great Meadows,*

39 N. J. L. 433; Lewis, Em. Dom. §§ 185, 187; 6 Am. & Eng. Enc. Law, 526.

The act is clearly within the sphere of legitimate legislation (6 Am. & Eng. Enc. Law, 2), and it is immaterial as to what particular emanation of the sovereign power it be referred. Having run the gauntlet of constitutional tests under the rules applicable to eminent domain, it will be readily sustained when referred to the police power. For the power of police is more comprehensive in its application, and the limitations upon its exercise are not so imperious and exacting. *Donnelly* v. *Decker*, 58 Wis. 461; S. C. 46 Am. Rep. 637; Tiedeman, Lim. Police Powers, 444; *Hagar* v. *Supervisors*, 47 Cal. 222; *O'Reiley* v. *Kankakee Valley Draining Co.*, 32 Ind. 169; *Coster* v. *Tide Water Co.*, 18 N. J. Eq. 54; Lewis, Em. Dom. § 186.

The local assessments necessary for the proper execution of the act in any given locality are not taxation, in the sense in which that term is used in art. 2, § 23, of the constitution, as has been often held by this court. *Carson* v. *St. Francis Levee Dist.* 59 Ark. 513; *Davis* v. *Gaines*, 48 *id.* 370; *McGehee* v. *Mathis*, 21 *id.* 40. See also *Sessions* v. *Crunkilton*, 20 Oh. St. 349; *Newby* v. *Platt*, 25 Mo. 258.

But it is said that, under this act, property may be taken without due process of law. "Eminent domain and police power are attributes of political sovereignty, for the exercise of which the legislature is under no necessity to address itself to the courts. Tiedeman, Lim. Pol. Powers, 374. It determines the mode and the occasion of the exercise of these supreme powers, untrammelled by constitutional restraints. It may or may not, in its discretion, clothe "the proceedings with the forms or substance of judicial process." And when provision has been made for just compensation to the landowner for his land taken, "the expression of the legislative will authorizing such taking is of itself due process." Tiedeman, Lim. Police Powers, 374.

This act, however, provides every prudential measure for the protection of the land owner that could be reasonably expected or required. Notice must be given, and a tribunal furnished where his remonstrance must be heard, before the appropriation of his land to the use of the public; and if he

is aggrieved thereby, he has the right to appeal. Sand. & H. Dig., §§ 1208–1210, 1216.

Section 1220 provides that where the lands belong to a non-resident, the assessment shall be charged on the tax books against the lands, and collected as other taxes. The contention that this is a discrimination against the non-resident in favor of the resident citizen, because the assessment against the latter is enforced by proceedings in the circuit court (§ 1232), is without merit. There is no discrimination in this. The assessment in each case is a lien upon the land. There is no discrimination in the amount of the assessment, it being proportioned to the benefits. It operates *in rem.* How can the difference in the manner of its enforcement operate to the prejudice of the non-resident land-owner? This provision is not in conflict with § 2, art. 4, or the constitution of the United States, guarantying equal privileges and immunities for citizens in the several states. See *Redd* v. *St. Francis County*, 17 Ark. 422–3.

But if § 1220 were unconstitutional, it could be stricken out, and the assessment would remain a lien upon the lands to be enforced, under section § 1232, which says: "The lien provided for in this chapter may be enforced by proceeding at law in the circuit court in any county in which said ditch or drain, or a part thereof, is located." The law as a whole is not unconstitutional. If any special provision be unconstitutional, and can be stricken out without affecting the validity of the whole act, it may be done, and the act allowed to stand. Section 1221, for instance.

Second. Were the proceedings thereunder in this case legal? Section 1232 provides for a liberal construction of the act, "to promote the drainage and reclamation of wet or overflowed land; and that amounts due to contractors holding the viewers' certificate of acceptance shall not be defeated by reason of any defect in the proceedings occurring prior to the order of the county court establishing the ditch; but such order or judgment of said court shall be conclusive that all prior proceedings were regular and according to law." This relieves us of the labor and necessity of considering any except juris-

dictional defects "occurring prior to the order of the court establishing the ditch."

.,    Sec. 1204 provides in part: "Before the county court shall establish any ditch or drain, there shall be filed with the county court of such county a petition signed by one or more of the landowners whose land will be liable to be affected by or assessed for the expense of the construction of the same, setting forth the necessity thereof, with a general description of the proposed starting point, route and terminus." The remainder of the section provides for the appointment of viewers by the county court, and prescribing their qualifications, and defining their duties. Appellant filed a petition, stating "that he was the owner of part of sections 24 and 25, in township 4 north, range 14 west, in Franklin county, Ark.; that said lands were near the Arkansas river; that on section 30, township 4, range 14 west, there were three several lakes or ponds, which were susceptible of being drained into the Arkansas river by a ditch running from about west to east, and through lands belonging to the estate of John W. McCulloch and B. L. Harton, Esq., emptying into the river on the land of George Donaghey; that his land and those of others were liable to be affected by, and assessed for, the construction of said drain; that the said route was the only practicable one for making said drain, and that said drain was necessary in order to drain said land." And he asked "for viewers to be appointed to inspect the premises, and to make report upon the public utility of such drain," etc. Viewers were appointed, as the law directs, and duly entered upon the discharge of their duties, and afterwards presented their report, setting up that they had performed their duty in strict accord with the order of the court, and the law in such cases provided. They reported that they believed the ditch would be of public utility, as well as conducive to the public health and welfare, and submitted plans showing two routes, and recommended one of them for adoption, which was as follows: "Beginning at the point marked "A" on the accompanying plat or map, 2,300 feet north of Arkansas river, on the half section line of sec. 30, T. 4 N., R. 14 W., between Cribbs and McCulloch, thence south on said line to the Arkansas river."

The route as recommended by the viewers, and as established by the court, commenced at "A" on the half section line of section 30 between Cribbs and McCulloch, and ran thence south on said line to the Arkansas river, shown by the line from "A" to "F" on the plat hereto appended.

It is contended that there was such a divergence in the "course of the ditch as set out in the petition," and that "made by the order of the county court," as to render the order of said court, and hence all subsequent proceedings thereunder, void.

The petition was jurisdictional, as was held by this court in *St. L., I. M. & S. R. Co.* v. *Dudgeon, ante*, p. 108. But what the petition should contain, in order to make it valid, was not there decided. The object of the petition was to bring to the attention of the court, in a general way, the locality where the public good might be subserved by the construction of a ditch. It was not intended that the petition should give any exact or definite description of the starting point, route, or terminus of the ditch that should be constructed. That was to be the work of the viewers. They were to be furnished with a certified copy of the petition and order of the court appointing them, and were to proceed "with a competent surveyor, to make *an accurate survey of the line of said ditch from its source to its outlet.*" § 1203.

The most casual scrutiny of the language of § 1204 will discover that the petition was not designed to make any precise alignment or description of the ditch. It was required to be signed, not by one or more land owners whose land *would be affected*, but only by one or more whose land *would be liable to be affected*, denoting an uncertainty that it would be affected, depending upon whether or not the ditch, as finally constructed, was the same as that decribed in the petition. In other words, allowance is made in the act for the probability that the route settled upon by the viewers may be so different from that decribed in the petition as not to affect or benefit the land of the signer or signers of the petition at all. Only a *general description* of the proposed "starting point, route and terminus" is demanded in the petition. Now the word "general" is opposed to *particular*. It means: "Not specific, vague, indefinite." Webster's Unabridged Dict. The language indicates that no precise "starting point, route or terminus" was to be set forth in the petition. The legislature, in describing the duty of the viewers in making the survey, said: "They shall make an *accurate* survey of the line." This shows that the legislature knew the meaning of words. Had it intended that a definite, fixed starting point, route, and terminus should be described in the petition, doubtless it would have used the term *accurate, definite, precise*, or some synonymous term. Had it used any of these qualifying words, instead of "general," the

argument of learned counsel for appellees on this point would have been irrefutable.

But when we construe the words, "with a general description of the proposed starting point, route or terminus," in connection with section 1206 (as we must do), it is clear that the above is the proper construction. That section is as follows: "In locating a ditch or drain, the viewers *may vary from the line described in the petition*, as they deem best; provided, they commence the ditch at the point described in the petition, and follow the line therein *as near as practicable*, and provided, further, that when there is not sufficient fall in the length of the route described in the petition to drain the lands adjacent thereto, they may extend the ditch below the outlet named in the petition far enough to obtain a sufficient fall and outlet; and when it will not be detrimental to the usefulness of the whole work, they shall, *so far as practicable*, locate the ditch on the division lines between lands owned by different persons, and they shall, *so far as practicable*, avoid laying the same diagonally across the lands, but they must not sacrifice the general utility of the ditch to avoid diagonal lines." Construing these sections, so as to make them consistent, and to give to the words of each their proper effect, the meaning is that there must be filed a petition describing in a *general way* the course of the proposed ditch from its source to its outlet; that the viewers, whose duty it is to make an *"accurate"* survey, and definitely fix the line, may vary from the line described in the petition, as they deem best; but they must follow this general course or line, as near as practicable, observing the other requirements,—to run on division lines between different land-owners, and to avoid laying the ditch diagonally across the lands, so far as same may be done without destroying the general utility of the proposed improvement. True, they must "commence the ditch at the point described in the petition." But no definite or fixed point has been described in the petition. If a particular starting point had to be specifically described in the petition where the viewers must commence, then, unless this fixed starting point were on the division lines, in order to run the ditch on these lines, and thus carry out the injunction of the statute, the viewers would have to lay the

ditch diagonally or collaterally across the land to reach these lines.

The petition in this case sufficiently conformed to the requirements of the statute. It called the attention of the court to three several lakes in sec. 30, township 4, range 14 west, near the Arkansas river, and susceptible of being drained by a ditch running into said river, describing the general course of the ditch as "from about west to east," and giving the names of the landowners through whose lands, according to this course, it would run, and where it would empty into the river. By reference to the map it will be seen that these lakes were almost parallel with each other and with the river. In order to drain each and all of them by the same ditch into the river, it was necessary to commence at the southern margin of lake No. 1, and run from that to lake No. 2, thence to lake No. 3, thence to the river. So that the "general description" of the starting point in the petition was lake No. 1 on the land of McCulloch, and the "general description" of the route was from "about west to east," and of the outlet, "the Arkansas river on the land of Donaghey." When the viewers came to lay out the ditch, to quote the language of one of the viewers, "they went to the premises indicated by the petition and order of the court in the case, made two surveys, and adopted the most practicable."

The one adopted runs from "A" to "F." It commences at the starting point covered by the general description in the petition, *i. e.*, the southern margin of the third lake from the river, number 1, on the division line between Cribbs and McCulloch. They ran the ditch on division lines between the different land owners, and on the quarter section line (thus avoiding traversing the land diagonally), and made the outlet of the ditch in the Arkansas river,—the terminus, according to the general description in the petition. The divergence made from the route of the ditch, as described in the petition, was such as the viewers were authorized to make, and such as they were in duty bound to make. The broad language of the sections quoted shows that the viewers were vested with large discretion to make changes in the route, so long as they adhered to the purpose to be accomplished. This they did in the case at bar. The purpose of the petition was to have certain lakes or ponds drained.

The proof shows that the route adopted, instead of the one which appellees contend should have been adopted, affected the same purpose, and at a great deal less expense.

Learned counsel have treated the petition as though it were designed, in some way, to operate as notice to the land owners, whose land might be affected by the construction of the ditch, of the proceedings of the viewers in locating same. Such is not the case. Every step in the proceedings, from the filing of the petition to the filing of the report of the viewers, was designed solely to give information to the court of the necessity for and feasibility of the proposed ditch. The petition was in a sense *ex parte*, and none of the subsequent proceedings were of an adversary character, until the filing of the report of the viewers, and not then unless their report was in favor of the proposed work. Sand. & H. Dig., § 1208.

This brings us to the question of notice. Since the legislature has lodged its power of eminent domain in the matter of ditches or drains with the county court, and has provided that the landowner may intervene, and show cause why the power should not be exercised, he must be given the opportunity to do so in the manner prescribed. Especially so when the landowner is given the privilege, as here, of contesting with the legislative agent: "First, whether said ditch will be conducive to the public health, convenience, or welfare; second, whether the route thereof is practicable; third, whether the assessments made for the construction of the ditch are in proportion to the benefits derived therefrom." *Id.* § 1216. The first and third of the above are conditions precedent to the exercise of the power of eminent domain. The third especially concerns the landowner, because it involves the question of his compensation. The statute granting the right to be heard concerning these matters before the county court, if, having had due notice, the landowner does not appear, he will be held to have waived his rights, and cannot be heard elsewhere. This shows that notice to the landowner, in the manner provided, was indispensable. These provisions are especially designed for the protection of the landowner, and of such, says Prof. Tiedeman, "there must be the most scrupulous observance." Tiedeman, Lim. Police Powers. The testimony of the appellant

and of the county clerk shows that the notice was given as the law requires.

The contention that "if the assessment be made in proportion to the benefits, there was no uniformity in the imposition of the burden," is not well taken. One of the viewers testified: "A uniform rule was adopted by us, and applied in apportioning the burdens of this drain on the landowners, each one having a burden assigned to him in proportion to his benefit." We find nothing in the record to show that the assessments were not "distributed among, and imposed upon, all equally, standing in like relation," who were benefited by the drain. *Davis v. Gaines*, 48 Ark. 370–83.

It follows that the ditch tax was a valid lien upon the land of appellees, and that the learned chancellor erred in declaring same illegal and void. The decree of the court is therefore reversed, and the cause is remanded, with directions to declare the ditch tax a lien upon the land, and to proceed to foreclose same in manner and upon such terms as the chancery court may direct.

BATTLE, J., (dissenting.)   I do not concur in the judgment or opinion of the court.

"It is essential," says Mr. Freeman, "that the jurisdiction of the court over a subject-matter be called into action by some party and in some mode recognized by law. A court does not have power to render judgment in favor of one as plaintiff if he has never commenced any action or proceeding calling for its action, nor has it, as a general rule, power to give judgment respecting a matter not submitted to it for decision, and over which it has jurisdiction. A petition or complaint must be filed in the court whose action is sought, or otherwise presented for its consideration in some mode sanctioned by law." 1 Freeman, Judgments, § 120.

Many illustrations might be given of the rule stated. A few will suffice. "The circuit courts of this state have jurisdiction to enforce the collection of debts according to an established procedure   A holds the bond of B for one thousand dollars, due and unpaid. He goes into a circuit court with the bond in his hand, and, without writ issued or any pleadings,

asks the court to award a rule against B to show cause why judgment should not be rendered against him for the debt and interest. The rule is accordingly awarded, executed, and returned, and judgment thereupon rendered for the debt, interest and costs. Such a judgment would be void, notwithstanding the court has jurisdiction of the subject and of the parties. Why void? Because, in the language of Mr. Justice Field, 'the court is not authorized to exert its power in that way.' " The same would be true if A should sue B on one bond, and in the same action decline to take judgment on the bond sued on, and take judgment on another bond of B, on which no suit had been instituted, without the consent of B. *Anthony* v. *Casey,* 5 Am. State Rep. 279; *Seamster* v. *Blackstock,* 83 Va. 232.

In *Munday* v. *Vail,* 34 N. J. L. 422, Chief Justice Beasley said: "It is impossible to concede that because A and B are parties to a suit, that a court can decide any matter in which they are interested, whether such matters be involved in the pending litigation or not. Persons by becoming suitors do not place themselves for all purposes under the control of the court, and it is only over these particular interests which they choose to draw in question that a power of judicial decision arises. If, in an ordinary foreclosure case, a man and wife being parties, the court of chancery should decree a divorce between them, it would require no argument to convince every one that such decree, so far as it attempted to affect the matrimonial relation, was void; and yet the only infirmity in such a decree would be found, upon analysis, to arise from the circumstances that the point decided was not within the substance of the pending litigation. In such a case the court would have acted within the field of its authority, and the proper parties would have been present; the single but fatal flaw having been the absence from the record of any issue on the point determined. The invalidity of such a decree does not proceed from any mere arbitrary rule, but it rests entirely on the ground of common justice."

According to the doctrine laid down, parties cannot sue for one ditch and recover another; cannot petition to the county court for one ditch and cause another and different ditch to be made, as in this case. An order directing the latter to be made

would be a nullity. In laying out a ditch under the laws of Wiconsin the court held in *Donnelly* v. *Decker*, 58 Wis. 461, that the supervisors "had the right to make any suitable variation from the line" fixed in the petition for the ditch "in their discretion, so that they did not so far depart from the line in the petition as to be materially another and different line." According to this decision, the identity of the ditch established as the ditch proposed in the petition must be substantially maintained.

The statutes of this state which empower the county court to establish ditches for the drainage of lands expressly provide as follows: "That, before the county court shall establish any ditch or drain, there shall be filed with the county court of such county a petition signed by one or more of the land-owners whose land will be liable to be affected by or assessed for the construction of the same, setting forth the necessity thereof, with a *general* description of the *proposed* starting point, route and terminus." The filing of this petition is made a jurisdictional prerequisite to the power to establish ditches for drainage. Two jurisdictional facts must be set forth in it: (1) The necessity of the ditch, and (2) a general description of the proposed starting point, route and terminus. Now, if the county court can establish a ditch without regard to the route described in the petition, why should the petition contain any description of the starting point, route and terminus? Why not ask the county court for an order establishing a ditch to drain certain lands, without any description of the ditch? If the county court is not to observe the line described in the petition, that part of the statute which makes it necessary to file a petition containing the description before it can establish the ditch is entirely meaningless and unnecessary.

The whole act upon this subject makes it appear that the legislature never intended that the county court should, when a petition has been filed, establish another ditch materially different from that asked for in the petition. The act provides that the petitioners "shall give bond, with good and sufficient sureties, payable to the state of Arkansas, to be approved by the county clerk, conditioned to pay all expenses in case the county court shall fail to establish said *proposed ditch or drain.*" What ditch or drain is referred to? Manifestly, the ditch described

in the petition. No other was proposed at the time of the filing of the bond, it being required to be filed with the petition. And why should he give bond to pay all expenses in case the county court shall fail to establish the proposed ditch, and say nothing as to what he shall do in case another shall be established in lieu of the one proposed? Because no other was to be considered or established.

After the filing of the petition and bond, the act provides that the county court shall appoint three viewers "to meet at a time and place specified by said court," "and it shall be the duty of the clerk thereupon to issue said viewers *a certified copy of the petition* and order of the court, who shall proceed at the time set in said order, with a competent surveyor, and shall make an accurate survey of *the line of said ditch or drain* [not a ditch] from its source to its outlet." The clerk is required to furnish them with a copy of the petition, to inform them what line they shall survey and examine. They are not authorized to survey any line materially different from that described in the petition.

Section four of the act provides: "In locating a ditch or drain, the viewers may vary from the line described in the petition as they deem best; *provided, they commence the ditch at a point described in the petition*, and follow the line therein, *as near as practicable;* and, provided further, that when there is not sufficient fall in the length of the route described in the petition to drain the lands adjacent thereto, they may extend the ditch *below* the outlet named in the petition *far enough to obtain a sufficient fall and outlet.*" They may vary, but not establish another distinct and independent line. They may vary, but must, nevertheless, commence the ditch at the point described in the petition, and follow the line therein as near as practicable. They may change the terminus described in the petition to a point far enough below to obtain a sufficient fall and outlet, but in no other manner and for no other purpose. It is true that this section provides that "when it will not be detrimental to the usefulness of the whole work, they shall, so far as practicable, locate the ditch on the division lines between lands owned by different persons, and they shall, so far as practicable, avoid laying the same diagonally across

the lands; but they must not sacrifice the general utility of the ditch to avoid diagonal lines." But this does not mean that they can disregard the route described in the petition, and establish one entirely different on divisional lines between owners of land. They should obey the mandatory provisions of the statute. They must locate the ditch between the points designated in the petition, provided they may change the terminus in the manner stated. While locating it between these points, they may follow divisional lines, when it can be done without impairing the usefulness of the whole work. This clearly indicates what divisional lines they may make a part of the route of the ditch, and that they are those which lie in or near the route designated in the petition. The identity of the ditch proposed and established should be substantially preserved.

The viewers are not authorized to recommend to the county court the construction of a ditch other than that decribed in the petition. The statutes say: "If the viewers find the *proposed* ditch or drain [the ditch described in the petition] not of public benefit or utility, they may report against the location of the same, in which case their report need only state they find the *proposed* ditch or drain [not a ditch] not to be of public benefit or utility;" and "it shall be the duty of the clerk, on said report being filed, if it be in favor of the proposed work" (the ditch described in the petition), to cause a notice to be given "of the pendency of said petition and the time set for the hearing thereof;" and "said county court, at the time set for the hearing of said petition, shall, if there is no remonstrance filed, proceed to hear said petition, and if he finds that the viewer's report is made in accordance with the provision of this act, and be in favor of the *proposed* work [not a ditch, but the ditch described in the petition], and he finds the proposed drain to be of public utility, or conducive to public health, or of public benefit or convenience, he shall establish the same, as specified in the report. But if the viewers report against the proposed work [not a ditch, but the ditch described in the petition], "the court shall dismiss the petition, and tax the costs as hereinafter provided."

It may be said that the act authorizing the construction of ditches provides that it "shall be liberally construed, to pro-

mote the drainage and reclamation of wet or overflowed land." But this does not authorize courts to so construe it as to set aside and annul its plain provisions. And it may be said that the act further provides that "amounts due to contractors holding the viewers' certificate of acceptance shall not be defeated by reason of any *defect* in the proceedings occurring prior to the order of the county court establishing *the ditch;* but such order or judgment of said court shall be conclusive that all prior proceedings were regular and according to law." But, as I have already shown, the ditch referred to is the ditch described in the petition, and the order or judgment and proceedings are those made or rendered and had in the establishing of such ditch. The county court is not empowered by the act to make or render or authorize any other. It would be doing violence to the plain language of the act to place any other construction upon it.

My conclusion is that a county court in establishing a ditch has no authority to so far depart from the route described in the petition as to locate it on materially another and different line,— that is to say, the ditch as located, commencing and ending as before stated must substantially come within the general description of the route required by the act to be set forth in the petition. The act says, "if the viewers report against the proposed work, the court shall dismiss the petition."

In the case under consideration, the ditch described in the petition and the one established by the county court are entirely different. So much of the petition as pertains to the description of the ditch is as follows: "On section 30–4–14 there are three several lakes and ponds which are susceptible of being drained into the Arkansas river by a ditch running from about west to east, and *through lands belonging to estate of John W. McCulloagh and B. L. Harton, Esq., emptying into the river on the land of George Donoghey.*" The description is very vague, and is by no means a compliance with the statute. In the form it is, the county court should never have acted upon the petition. An inspection of a diagram of the lakes, river, and lands adjacent will show that the lakes could not be drained by a ditch of the description set out in the petition, without one or more lateral drains to convey the water into the main ditch.

The diagram set out in the opinion of the court shows the ditch proposed, as near as I can imagine, and the one established. From it it will be seen that the common object of the two was the drainage of the same lakes into the Arkansas river, and that both are, perhaps, in the same vicinity.    Both may be straight. This is the only resemblance, so far as is shown.    The identity, substantially or otherwise, I am utterly unable to see.

As to the constitutionality of the act, I concur with the court, so far as it is involved in this action.

I think the decree of the chancery court should be affirmed.