[No. 3095.   Dec. 12, 1925.]

In re PROPOSED MIDDLE RIO GRANDE CONSERVANCY DIST.

[242 Pac. 683.]

### SYLLABUS BY THE COURT

1. Under subsection 2 of section 205, c. 140, Session Laws 1923 (Conservancy Act), certificates of county treasurers are admissible in evidence if properly executed, notwithstanding being made upon basis of data furnished by persons not officials; there being no showing that such certificates were fraudulent or incorrect as to the facts certified therein.

2. The certificates themselves, supplemented by other evidence, examined, and held to be substantial evidence to support findings of fact complained of.

3. The Conservancy Act is not unconstitutional because of the provisions of section 903 thereof restricting time for appeal and providing that same shall not delay proceedings except where appellant is entitled to a jury trial under the Constitution.

4. Sections 202 and 205 of the act do not violate section 14 of the Constitution of the United States or section 8 of article 11 of the Constitution of New Mexico, or section 2 of article 2 thereof.

5. Section 301, providing for the appointment of the board of directors for the conservancy district by district court, does not violate section 3 of article 2 of the Constitution of New Mexico.

[1] 22CJ p. 809 n. 97.  [2] 36CJ p. 1010 n. 81.  [3] 19CJ p. 667 n. 41.  [4] 12CJ pp. 935 n. 59; 1157 n. 92; 20CJ p. 62 n. 51; 36CJ p. 998 n. 12.  [5] 12CJ p. 935 n. 59.  [6] 12CJ p. 993 n. 84.  [7] 36CYC p. 985 n. 69.  [8] 20CJ p. 580 n. 53; 40 Cyc p. 814 n. 60  [9] 36CJ p. 1016 n. 50; 36Cyc p. 1010 n. 51.  [10] 36CJ p. 999 n. 44.  [11] 36CJ p. 1016 n. 49.  [12[ 36CJ p. 998 n. 18  New.

6.   Section 515, giving priority to assessment lien except as to taxes, does not violate section 19 of article 2 of the New Mexico Constitution regarding the impairment of the obligation of contracts.

7.   **Held,** that the Conservancy Act is a general law within the purview of section 24 of article 4 of the New Mexico Constitution.

8.   Section 201 is not repugnant to section 1 of article 16 of the New Mexico Constitution.

9.   Subdivision 3 of section 402 does not violate section 24 of article 4 of the New Mexico Constitution relating to the enactment of special laws, nor section 3 of article 8 thereof, providing tax exemptions to the state of New Mexico, and all counties, towns, cities, and school districts.

10.   The provisions of the Conservancy Act, conferring jurisdiction upon a district court to try condemnation cases involving lands which may be beyond the territorial limits of such district, is not unconstitutional.

11.   Section 502 of the act, authorizing preliminary assessments to defray the preliminary costs of surveys, engineers' fees, etc., does not violate section 1 of article 8 of the Constitution of New Mexico.

12.   The Conservancy Act is not unconstitutional because of a possibility that an attempt might be made to use its provisions solely for reclamation purposes. The question of a perversion of the purposes of the act is not in this case, the findings of the court establishing that the district is formed in accordance with the legitimate purposes of the act.

Appeal from District Court, Bernalillo County; Helmick, Judge.

In the matter of the organization of a proposed conservancy district to be known as the Middle Rio Grande Conservancy District. Case between protestants to organization of district and petitioners for establishment of district. From a judgment in favor of the petitioners, the protestants appeal. Affirmed.

O. A. Larrazolo, of Albuquerque, for appellants.

R. P. Barnes and Pearce C. Rodey, both of Albuquerque, for appellees.

### OPINION OF THE COURT

BICKLEY, J.   This case involves the construction of the Conservancy Act; the same being chapter 140

of the Session Laws of the State of New Mexico for the year 1923, entitled:

"An act to provide for the organization of conservancy districts for the purpose of co-operating with the governent of the United States under the terms of the federal reclamation law and other federal laws, and to define the purpose and powers thereof."

These proceedings come before this court on a stipulated record designated, "Agreed Statements of the Case and of the Facts Proven on Appeal to the Supreme Court of the State of New Mexico." From such agreed statement of the case, we find therein:

"(1) That a petition praying for the establishment of a conservancy district to be known as the Middle Rio Grande conservancy district was signed by the required number of landowners under the law, and that it was also signed by the city of Albuquerque, a municipality, which said municipality is within the proposed district, and was duly and properly authorized thereunto, and that said petition was in all things drawn up in conformity with the requirements of law, and was legally sufficient for the purposes it sought to accomplish.

"(2) That proper and sufficient notices of the pendency of said petition for the establishment of the conservancy district were duly published in English and Spanish, in the manner and for the time required by law.

"(3) That the demurrer of the protestants as same appears on pages 3 to 9, inclusive, of the transcript, was overruled by an order of the district court entered on August 26, 1925, wherein the court found: 'That the act commonly known as chapter 140 of the Session Laws of the State of New Mexico for the year 1923 is in all respects constitutional and within the police power of the state of New Mexico.'

"(4) That there was filed in said cause a protest purporting ot be signed by 3,046 people, who claimed to live within the proposed district and also claimed to own 429,271 acres of land within the proposed district, but that, after a hearing had on the merits, at which evidence was taken and certificates from the county treasurer and ex officio collectors of taxes for the counties of Socorro, Valencia, Bernalillo, Sandoval, Santa Fe, Taos, and Rio Arriba, state of New Mexico, the court made its findings of fact and conclusions of law as the same are shown on pages 20 to 23 of transcript, and on August 26, 1925, entered an order declaring the organization of the Middle Rio Grande conservancy district, adjudicating all questions of jurisdiction and findings on hearing.

"(5) Thereafter the board of directors of the Middle Rio Grande conservancy district made a preliminary fund assessment of 25 cents an acre on the lands within the Middle Rio

Grande conservancy district and the same was in effect approved by the court by 'order regarding preliminary fund assessment' entered September 8, 1925.

"(6) And from all of said proceedings an appeal has been taken by protestants to this court, attempting to attack the constitutionality of said Conservancy Act and the proceedings had in the organization of the Middle Rio Grande conservancy district, as said proceedings are set forth in the stipulated record now before the Supreme Court of the state of New Mexico."

Certain findings of the court will be referred to during the course of this opinion.

There are 13 assignments of error presented by appellants. Attorneys for appellees have filed an analysis of assignments of error and points raised on appeal which contain 15 points, which they ask this court to decide. For convenience, we will consider the points as presented by this analysis.

"(1) Does subsection 2 of section 205, c. 140, of Sessions Laws of 1923 (Conservancy Act), providing for certificates of county treasurers showing total number of owners, number of owners signing protest, total acreage, and number of acres owned by signers of protest, prohibit county treasurers from adopting as their own information or data furnished by abstracter and surveyor, taken from last tax rolls of his county and certifying the same to the district court under his official seal?

"(2) Were certificates of county treasurer inadmissible in evidence because based on information furnished by abstracter and surveyor, taken from last tax rolls, or did such fact only go to the credulity of the certificates made prima facie evidence under the Conservancy Act? On the record and findings of the court below was there evidence to support the decree declaring the organization of the conservancy district?"

[1] Subsection 2 of section 205 of the Conservancy Act is as follows:

"Upon the filing of such protesting petition, it shall be the duty of the clerk forthwith to make as many certified copies thereof, including the signatures thereto, as there are counties into any part of which said proposed district extends, and forthwith to place in the hands of the county treasurer of each of such counties one of said certified copies. Thereupon it shall be the duty of each of such county treasurers to determine from the last tax rolls of his county, and to certify to the said court under his official seal, on or before the tenth day prior to the day fixed for the hearing afore-

said, the total number of owners of the land situate in said proposed district within his county.   *   *   * "

It is not contended that the certificates are not fair on their face, and no exception was taken on the grounds of lack of proper and formal execution.   No charge of fraud or mistake in their execution is made. However, the county treasurers for certain counties were called to the witness stand and testified as stated in the agreed statement of facts as follows:

"That the county collectors for the counties of Santa Fe, Sandoval, Bernalillo, Valencia, and Socorro were put on the stand by the protesting parties herein to testify, and that each one of said collectors testified, over the exception and objection of counsel for petitioners, that, although he had been furnished by the clerk of the district court with a certified copy of the protest petition filed in this cause in the form and manner required by the statute, and furnished with a correct map showing the boundaries according to sections and townships in his county and in each county in the district, and furnished complete instructions regarding his duites under the law, he was not acquainted with the boundaries of the proposed district within his county; that he did not know accuratcly the number of people that lived within the proposed district in his county; that he did not know the number of acres within the proposed district in his county and did not know the amount of land owned within the proposed district by the protesting parties in his county; that the figures and the information contained in the certificate that he had prepared and signed were not taken by him from the tax rolls of his county, but that he took the figures as they were given to him by Mr. Ira Sprecher, a licensed and bonded abstracter, who is the president of the Chamber of Commerce of Albuquerque, N. M., and who was assisted in the preparation of said figures by Edmund Ross, a licensed surveyor, who located for the purposes of said work the boundary lines of the district in the various counties, and the said Ira Sprecher testified that the figures and information given by him to the said treasurers, and by them set forth in their certificates, was taken from the 1924 tax rolls, and was a true statement of the facts as disclosed by said tax rolls."

[2] The court made the following finding relative. to these certificates and the protesting petitions:

"As to the matter of objectors: The court will find that they are not sufficient in number or acreage. In this respect the court will state that he has examined the various objections filed in this matter, and finds that a great many of them are in the same handwriting. However, the court does not attach any importance to this, or think that there is any fraud or anything of this kind. No doubt all the people

whose names are signed intended to object, whether their names were written by themselves or by somebody for them. The court also notices, in looking over the list of the objectors, that for the most part they are small holders, a vast number of them owning from one to five acres. The mere fact that they are small holders, however, does not lessen the importance of the objections; a man who owns one acre has as much right to consideration as a man who owns a thousand, but in the matter of expenses, and it is quite obvious that the expenses of this district will undoubtedly be large, they will fall upon the big holders and the people most able to bear it. The expense of the man with a few acres will be very small, even though the expense of the district is large, and it is conceivable that the benefits to him will be very substantial."

No evidence was introduced by protestants to prove that the certificates were incorrect or to show that in fact the protesting petition was signed by a majority of owners of land in the district and representing a majority of the acreage within the district. Not one owner of real property or any public corporation in the district filed any objection to the organization of the district as would have been permissible under subsection 5 of section 205 of the Conservancy Act, which reads as follows:

"Any owner of real property or any public corporation in said proposed district not having individually signed a petition for the organization of such district, and desiring to object to the organization and incorporation of said district may, on or before the date set for the cause to be heard, file objections to the organization and incorporation of such district. Such objections shall be limited to a denial of the statements in the petition, and shall be heard by the court as an advanced case without unnecessary delay."

The certificates were fortified with the presumption of regularity which always attends the official acts of public officers. In addition to this, it is a principle generally accepted as wise that a public officer will not be permitted to impeach his official acts.

"Estoppel of Public Officers.—An officer, when he performs an act, in the course of his official duty, cannot be heard to say what he intended thereby. The law attaches consequences to the act, without reference to the private intention of the officer. He has no power to explain away his legal acts, or their legal effect. To do so would give effect to the intention of the officer rather than the law. And it is a familiar principle that a public officer making a return

of his doings on a writ shall not be allowed to gainsay the truth of it." 22 R. C. L. 474.

Furthermore, the court is admonished by section 415 of the Conservancy Act:

"No fault in any notice or other proceeding shall affect the validity of any proceeding under this act, except to the extent to which it can be shown that such fault resulted in a material denial of justice to the property owner complaining of such fault."

Therefore, when the protestants urged an objection to the certificates as to the manner of their making up, and which objection could be supported only by strict technicality, if at all, it was proper for the court to consider whether the fault complained of resulted in a material denial of justice to the objecting parties, and, when no showing of a lack of correctness or intergrity in the certificates was made, the court was warranted in overruling the technical objections. In additon, we might observe that it is the experience of every day that offcials certify to the truth of facts of which they have no personal knowledge. If the appropriate official of the federal government is requested to certify as to the population of a particular county or city, he would do so, but such certificate would not be made upon his personal knowledge, but from information gathered by census investigators who, in turn, usually rely upon unofficial statements made to them during the process of information gathering. Frequently, the statement of one member of a household as to the number of persons residing in a particular domicile is accepted as true. Many other familiar illustrations will occur to the reader. We notice, also, that the court, in making its findings relative to the facts recited in said certificates, stated that such findings were "based upon certificates of the county treasurers aforesaid and upon other evidence oral and documentary taken by the court." Under such circumstances a strong presumption attends the finding as to its correctness.

We therefore conclude that there was no error in the admission of the certificates in evidence and that there

was substantial evidence to support the decree declaring the organization of the Middle Rio Grande conservancy district.

The remaining points involved in the main are directed to the constitutionality of various provisions of the Conservancy Act. Before taking up the particular constitutional considerations raised, it may be beneficial to note the historical background of our Conservancy Act. A conservancy law of Ohio was passed February 5, 1914, and may be found in volume 104, Ohio Laws of 1914, p. 13, and is entitled:

"An act to prevent floods, to protect cities, villages, farms and highways from inundation and to authorize the organization of drainage and conservation districts."

This law was passed by the Legislature of Ohio after the great Dayton flood in 1913, when the Miami river flooded the valley and destroyed large portions of the city of Dayton, causing the loss of hundreds of lives and great property damage. The Conservancy Act of Colorado was enacted April 29, 1922, and was entitled:

"An act to provide for the organization of conservancy districts and to define the purposes and powers thereof." Laws Colo. 1922 (Ex Sess.) p. 11.

This Colorado law was enacted largely as a result of the great Pueblo flood disaster wherein many lives were lost and great property damage suffered.

We have made a careful comparison of the New Mexico Conservancy Act with the Conservancy Acts of Ohio and Colorado, and find that in the main the provisions of all three acts are the same. The Colorado act followed the Ohio act, making such changes as seemed suitable for the conditions prevailing in the Western states, and the New Mexico act followed very closely the Colorado act, occasionally including a provision which was in the Ohio act and omitted from the Colorado law. It is asserted that there has been and is danger of disastrous floods in the territory comprising the Middle Rio Grande district. As to the imminence of such danger, it is not our province to conclude.

That was the Legislature's province. Both the Ohio and the Colorado Conservancy Acts have been before the courts of last resort of those states for construction, and the cases are very instructive, and deal with practically all of the constitutional objections raised by appellants in this case. In the case of Silvey v. Commissioners of Montgomery County (D. C.) 273 F. 202, which was dealing with the Conservancy Act of Ohio, the court cited many cases construing the act, and said:

"Rarely has a law been found which has been assailed with such frequency or from so many angles. It has withstood every test. The Ohio courts for some time past, as evidenced by many cases, have treated its constitutionality as settled beyond controversy, some of which cases are Koehne v. City of Dayton, 97 Ohio St. 341,119 N. E. 651; Miami Conservancy District v. Mitman, 100 Ohio St. 315, 125 N. E. 875; Miami Conservancy District v. Bowers, 100 Ohio St. 317, 125 N. E. 876; State ex rel. Silvey v. Conservancy Dist. Co., 100 Ohio St. 483, 128 N. E. 87; State v. Valentine, 94 Ohio St. 440, 114 N. E. 947; County of Miami v. Deeds, 5 Ohio App. 106; Brady v. Miami Conservancy District, 11 Ohio App. 240; Miami Conservancy District v. Bowers, 12 Ohio App. 405." servancy District v. Shade, 12 Ohio App. 169; Miami Conservancy District v. Bowers, 12 Ohio Appl. 405."      :

The Colorado Conservancy Act was construed in the case of People v. Lee, 72 Colo. 598, 213 P. 583, decided by the Supreme Court of Colorado in 1923.

[3]      We will now consider in detail the constitutional objections to the act as presented by the analysis of the assignments of error.

"(3)      Is the Conservancy Act constitutional in its provisions under section 903 thereof, restricting time for appeal, and providing that the same shall not delay proceedings except where appellant is entitled to a jury trial under the Constitution."

"(11)      Is section 903 of the Conservancy Act in violation of section 2 of article 6 of the Constitution of the state of New Mexico, because the same does not permit appeals to interrupt or delay any action or prosecution of any work 'except where the appellant is entitled to a jury trial under the Constitution of the state of New Mexico,' and does said section 903 violate section 18, art. 2, of the Constitution of the state of New Mexico regarding due process and equal protection of the law?"

The portion of section 903 involved in this proposition is subsection 1 thereof:

"No appeal under this act shall be permitted to interrupt or delay any action or the prosecution of any work, except where the appellant is entitled to a jury trial under the Constitution of the state, in which case only so much of the work shall be interrupted or delayed as would constitute a taking or damaging of the property of such appellant."

It is observed that this subsection provides that the work shall not proceed in such a manner as would violate the right of an appellant entitled to a jury trial under the Constitution of this state, or which would constitute a taking or damaging of the property of appellant. Such taking of property apparently refers to the taking of land or improvements thereon by condemnation proceedings, and not the taking of property as a result of the levy of assessments to pay for the work in proportion to the benefit derived. As to such assessments, it has been held that, if the party whose land is to be assessed has an opportunity of a hearing upon notice, it is not essential to the requirements of due process of law that such party be afforded an opportunity to appeal. In People v. Lee, supra, the court said:

"There can be no constitutional objection to the Conservancy Act because it provides (in section 6 thereof) that no appeal or writ of error shall lie to review the order establishing the district. There is no constitutional right of appeal or to a writ of error. Speaking of the establishment of drainage districts, it is said in 19 C. J. 667, that the Legislature may, in its discretion, and in the absence of constitutional inhibition, limit the right of appeal or deny it altogether. The right of appeal is not essential, even in the matter of assessments. 12 C. J. 1264, note 30."

See, also, Page & Jones, Taxation by Assessment, No. 142, and cases there cited:

"142. If sufficient notice of the original making and apportionment of the assessment is given and a full hearing upon the merits is provided for, appeal is not essential to a compliance with the provision forbidding a taking of property without due process of law and may accordingly be dispensed with."

See, also, Jordan v. Jordan, 29 N. M. 95, 218 P. 1035, where we said:

"The right of appeal to this court is nowhere granted by the Constitution. By section 2 of article 6, the appellate jurisdiction of this court is prescribed, but the right of litigants

to appeal and thereby invoke such jurisdiction is not there granted; such being left to the Legislature."

But section 903 does not deprive appellant of the privilege of appeal. Subsection 2 of section 903 provides for appeals from all orders and decrees of the district court so that the fact of the work not being delayed pending a final determination on appeal of the rights of appellant would not deprive him of the privilege of appeal but merely of a supersedeas or stay of further proceedings in instances where he is not entitled to a jury trial. We see no repugnancy to the Constitution in the provisions quoted from subsection 1 of section 903.

"(4) Do sections 202 and 205 of the Conservancy Act, regarding petitions for the establishment of the conservancy district and hearings on said petition, violate Amendment 14 of the Constitution of the United States or section 8 of article 2 of the Constitution of the state of New Mexico, the former providing for due process and equal protection under the law, and the latter free exercise of the right of suffrage? In other words, does the Conservancy Act violate the due process and equal protection provisions of the federal Constitution, and are the electors or property owners within the conservancy district entitled as a matter of law to vote in the selection of a board of directors therefor?

"(5) Do sections 202 and 205 of the Conservancy Act, providing for petition to create conservancy district and hearing upon notice of said petition, violate section 2 of article 2 of the Constitution of the state of New Mexico (Bill of Rights). in that the number of petitioners required to initiate a petition may be less than a majority of all the property owners?

"(6) Does section 301, providing for the appointment of the board of directors for the conservancy district, violate section 3 of article 2 of the Constitution of the state of New Mexico, regarding right of the people to govern themselves, or is said election invalid because said directors are not elected by vote of electors or property owners?

[4, 5] Points 4, 5, and 6 are related, and appellees complain of the procedure outlined in the act is opposed to our principle of government of majority rule, and that such procedure impinges upon the power of the people to manage and control their own affairs, and argue that such procedure is a delegation of the power of taxation and other powers inherent in the people themselves, and also a delegation of the power of taxa-

tion which the people have vested in the Legislature by the organic law.

Counsel for appellants complain that the board of directors of the Middle Rio Grande conservancy district is appointed by the district court and not elected by vote of the property owners of the district. The same is true both in Ohio and Colorado, and yet the constitutionality of these acts has always been upheld in the state and federal courts. In the case of People v. Lee, previously cited, the court says on this subject:

"Whether owners of land have any right to participation in the administration of quasi municipal corporations by vote or otherwise' is a political question merely. The right of the Legislature to create a quasi municipal corporations and provide for the manner of its administration and the personnel of its officers in any manner it may see fit is well established. People v. Earl, 42 Colo. 238, 94 P. 294."

And again, in Silvey v. Com'rs of Montgomery Co., Ohio, 273 F. 206, it is said:

"The Fourteenth Amendment to the federal Constitution does not deprive the state of the power of determining whether the officers of the conservancy district shall be appointed or be elected by the people, or the duties to be performed by them; nor does it invalidate a tax or an assessment lawfully made by such officers for a duly authorized improvement, or deprive the district as a political subdivision of the power to levy and collect taxes or assessments to pay the amount charged against property or political subdivisions, such as municipalities, counties, or townships, within such district."

Counsel for appellants complain about taxation without representation, but we believe that they overlook the distinguishing features between a general tax which is levied for the support of the government and special taxes or special assessments levied according to benefits. The court, in the case of Miami County v. City of Dayton, 92 Ohio St. 215, 110 N. E. 726, decided under a similar act:

"While the letter of the act uses the word 'tax' in a general sense, the whole act, its spirit, its subject-matter, and its actual operation, taken together, make it manifest that the word 'tax' as therein used is special and local and what is known under the laws of Ohio as an 'assessment.' * * *
Taking the act by its four corners and its practical operation,

it is self-evident that such assessment is to be made with ref-
erence to benefits and burdens and not according to any
whimsical, arbitrary, or unreasonable standards, and by
reasons thereof it does not violate the provision of the federal
Constitution as to 'equal protection of the laws.'" (Taken
from syllabus of the case.)

In the case of Davy v. McNeill et al., 31 N. M. 7, 240
P. 482, recently decided by this court, we considered
the difference between taxes under the revenue laws
and "special taxes" in the nature of assessments for
benefits, as used in the irrigation district law of New
Mexico, and quoted therein from the case of Newby v.
Platte County, 25 Mo. 258, 269, as follows:

"There is a marked difference between general taxation and
special assessments for local objects, and the word 'tax' may be
used in a contract or statute so as not to embrace within its
meaning local or special taxes, although both kinds of taxation
derive their authority from the general taxing power."

Other authorities to the same effect are cited in our
opinion in that case. Attention is called to subsection 5
of section 103 of the Conservancy Act, which is as fol-
lows:

"(5)   Whenever the term 'tax' or 'taxes' is used, and not
otherwise specified, with reference to levies for benefits, dam-
ages, construction, improvements or maintenance it shall be
taken to mean special taxes or special assessments."

See, also, Lake Arthur Drainage District v. Field, 27
N. M. 183, 199 P. 112, where we decided that specific
assessment on property for improvements, based on ben-
efits, cost of which is assessed against the property, is
not a tax within the constitutional sense.

As evidence that the act contemplates assessments ac-
cording to benefits, section 305 requires the directors to
prepare a plan for the improvement for which the dis-
trict was created, and such plans, data, etc., shall set
forth properly "the location and character of the work,
and of the property benefited or taken or damaged,"
etc. Again, in section 402, it is provided that the board
of appraisers shall "proceed to appraise the benefits of
every kind to all land and property within or without
the district, which will result from the organization of
said district and the execution of the official plan."

And again, in the same section, "the appraisers shall also appraise the benefits and damages, if any, accruing to public corporations, as political entities, and to the state of New Mexico." And, again, in section 403, as to lands affected outside of the district, reference is made to appraising the benefits and damages to such land. Other sections of the act are to the same general effect. Indeed, it is quite evident that an unusual opportunity was taken to express the plan of assessment based on benefits and burdens.

Appellants also complain because the law does not require that a majority of the land-owners of the district shall be required to sign the petition for the organization of the district. Under the Ohio and Colorado Conservancy Acts, the proceedings to form a district are initiated by a petition signed by property owners; the only difference between those acts and that of New Mexico being that in Ohio 500 freeholders are required to sign the petition, and in Colorado 200 landowners are required, and in New Mexico 100 owners of land must sign the petition. In case less than 100 sign the petition, then it must appear that the number of signers are a majority of the owners of land situated within the limitations of the proposed district. While, under the view we take of the matter, the question of majorities and percentages of the signers to the petition for the organization of the district, and the number of signers to the protesting petition, is immaterial, still, it is interesting to note that in the various counties of the conservancy district, as appears by the certificates, there were in some of the counties no protestants and in some a very small percentage of the owners and acreage were represented in such protesting petitions. For instance, n Sandoval county, there are in the district 192,960 acres owned by 702 owners, of whom 169, owning 2,069 acres, protested. In Rio Arriba county, the total number of acres is 109,480, owned by 871 owners, and no one from this county signed the protest. In Taos county there are 5,760 acres, owned by 14 persons. No one signed the protest. In the county of Bernalillo, the number of acres is 221,120 owned by 9,226 persons, and pro-

tested by 766 persons owning 60,718 acres. In the county of Santa Fe there are 100,800 acres owned by 853 persons.    No one signed the protest.    In the county of Socorro, there are 637,700 acres owned by 2,861 owners, protested by 523 persons owning 163,555 acres. In Valencia county there are 378,880 acres owned by 1,982 owners and protested by 657 persons owning  95.693 acres.    So it will appear that in three of the seven counties of the district there were no protestants; in one, less than 25 per cent. protested; in another less than 10 per cent.; and in another, less than 20 per cent.; and in another less than 33 1-3 per cent.

It has been frequently held by the Supreme Court of the United States, in cases similar to this, that no constitutional rights were violated so long as notice and hearing is given on the amount of assessments, and that the Legislature could by legislative fiat create the district and declare the benefits.  The people have, by their Constitution intrusted much of their political power to their duly elected representatives in the  Legislature, subject to the power reserved by them to disapprove, suspend, and annul laws enacted by the Legislature, except laws of a certain kind, among the exceptions being "laws providing for the preservation of the public peace, health and safety."  The power to enact such laws without referendum was intrusted to the Legislature alone.  In this case it was found by the court:

"That the public safety, health, convenience, and welfare will be promoted by the organization of the conservancy district substantially as prayed in said petition, amended petition and additional petitions in support thereof, and that a public necessity exists for the construction of the proposed work."

Not long ago we had before us for consideration the case of Davy v. McNeill et al., heretofore referred to, involving the construction of chapter 41, Session Laws of New Mexico 1919.  The validity of the act was assailed upon the ground, among others, that signers to the petition to organize an irrigation district were limited to resident freeholders. We said:

"Only resident freeholders may sign the petition to the board of county commissioners for initiating the district. 'Resi-

dent freeholder' is defined as any citizen of the United States who owns lands within the district, or the evidence of title to such land, or is an entryman under the public land laws of the United States, or a purchaser under contract of purchase of state lands, and shall include corporations, associations and copartnerships owning land within the district. It is only in signing the initiatory petition that the signers are limited to resident freeholders as defined by the act. This question was before the Supreme Court of California in Re Bonds of the Madera Irrigation District, 92 Cal. 296, 320, 28 P. 272, 277, 14 L. R. A. 755, 27 Am. St. Rep. 103, in which the court said:

"It is objected to this, that it is placing in the hands of those not interested the power of imposing a burden upon the owners of the land, who may be a small minority of the electors within that district, or who may even be nonresidents of the district. This, however, is a matter which was addressed purely to the discretion of the Legislature. Whether such a petition should be made by the owners of a fixed proportion of the land, as was required in the reclamation law, or whether there should by any qualification to the petitioners, or whether there should be any limit to the expenses which they were authorized to incur for the purposes of the improvement, are questions which were solely for the consideration of the Legislature. * * * It must be observed, however, that this petition has no binding operation, but is merely the initiatory step which gives to the board of supervisors a jurisdiction to act upon the expediency or policy of authorizing the creation of the district."

"The fact that only resident freeholders may sign the initiatory petition is immaterial, as no property rights are affected thereby."

So, in the case at bar, no property rights are affected by the petition for the formation of the conservancy district or by the formation thereof. We do not think that the lack of a requirement that a majority of the land owners must initiate the petition, or that the absence of provisions reposing the management of the district in the property owners, is fatal to the validity of the act.

Then, again, appellants urge that the act is invalid because it provides for a delegation of legislative power in that the court, upon the organization of the district, is authorized to appoint the directors of the district instead of the directors being elected by the people. We again quote from the case of Miami County v. City of Dayton, supra:

"Again, it is claimed with much force that the conservancy

statute undertakes to delegate legislative power. It is not specifically pointed out just what powers are strictly and wholly legislative, but it certainly cannot be seriously contended that the powers vested in the court of common pleas pertaining to the creation of the district are in any strict sense legislative powers. A hearing is involved, a trial upon certain issues made by the petition and the objections thereto, and certain findings must be made by the court of common pleas in that behalf, all of which are essentially judicial in their nature. But it is claimed that the appointment of the directors and appraisers and their functions are legislative in character and amount to a delegation of legislative power. It is difficult to see how this is any more a delegation of legislative power than the appointment of receivers and the various orders of court authorizing them to continue a going concern or to sell the same and distribute the proceeds, or to appoint appraisers in any given case, or any of the numerous boards that have heretofore been appointed by courts for the purpose of carrying out the substantial provisions of various statutory proceedings. But suppose that the powers so conferred are quasi-legislative, it must be conceded they are also quasi-administrative and quasi-judicial, and in such cases, where the twilight zone of distinction prevails it has always been regarded as the right and duty of the Legislature to determine the nature of the function exercised and the body that should exercise it. In this case they have conferred that power upon the court of common pleas. Whether that was wise or not is not important in this case. That should have been addressed to the legislative body that enacted the law. We are satisfied that there is no constitutional prohibition against it."

The same question was before the Supreme Court of Colorado in the Case of People v. Lee, supra, and the court quite fully discussed this proposition, and we quote as follows:

"The power of appointing officers is more executive than it is legislative. 12 C. J. 874. Such power, taken by itself is not judicial, but, when it is incidental to the exercise of judicial functions, as it is under the Conservancy Act of Colorado, its existence does not vitiate the statute. In the brief of the Attorney General and counsel for relators, it is asserted that under the act .the district court in perpetuity is made the head of a political subdivision of the state. This is equivalent to saying that the court is given administrative powers and functions.

"Statutes which vested in the courts the power to appoint drainage dommissioners have been held constitutional, 19 C. J. 625. In Scott v. Brackett, 89 Ind. 413, it was said that an act providing for the appointment of commissioners of drainage is not one imposing on the court legislative and executive duties. The court said: 'The fact that they are appointed by the court * * * does not render them mere agents of the court, nor does it impose upon the court the duties to be discharged by them.' Our Conservancy Act is similar to that

of Ohio, and the latter was held constitutional as against the objection now being considered.    Miami County v. Dayton, 92 Ohio St. 215, 110 N. E. 726.

"In State ex rel. Skordahl v. Flaherty, 140 Minn. 19, 167 N. W. 122, it was held that a statute authorizing the courts to organize drainage and flood control districts, and 'to appoint a board of directors to carry the purposes of the act into effect, is not unconstitutional because of an unwarranted delegation of legislative functions and powers to the judiciary.

"Conservancy or flood control districts stand on the same footing as drainage districts.    This seems obvious. It is therefore pertinent to quote the following from 19 C. J. 625: The Legislature having authority to provide for the construction of drains and the organization of drainage districts, in the absence of constitutional provision to the contrary, this general power carries 'with it, by necessary implication, all other powers necessary to make the general authority effective and to accomplish the results intended. Hence, the Legislature may designate the officers to construct and maintain drains and the mode of their selection. The power to appoint drain commissioners may be conferred upon the Governor, or the Legislature may provide for the appointment of drainage officers by    *    *    *    the courts.    *    *    *  '

"In Travelers' Insurance Co. v. Industrial Commission, 71 Colo. 495, 208 P. 465, we announce the rule that before a statute can be held unconstitutional as delegating legislative power, it must clearly appear that the power in question is purely legislation. This court there also quoted with approval the following from    State v. Public Service Commission, 94 Wash. 274, 162 P. 523: 'The constitutional division of all governmental powers into legislative, executive and judicial is abstract and general.    Their complete separation in actual practice is impossible.    The many complex relations created by modern society and business have produced many situations which can be adequately met only by vesting in the same administrative officers or bodies powers inherently partaking to some extent of any two or all of these three functions.' "

The Supreme Court of the United States, in the recent case of Ex parte Grossman, 267 U. S. 87, 45 S. Ct. 332, 69 L. Ed. 527, 38 A. L. R. 131, decided March 2d of this year, although dealing with an entirely different character of case, expressed through Chief Justice Taft an opinion similar to those expressed by the state courts above referred to, to the effect that it is not always true that the different branches of the government may be considered separate and independent. As this is a late expression from the court of highest dignity, we quote as follows:

"The federal Constitution nowhere expressly declares that the three branches of the government shall be kept separate and independent. All legislative powers are vested in a Congress. The executive power is vested in a President. The judicial power is vested in one Supreme Court and in such inferior courts as Congress may from time to time establish. The Judges are given life tenure and a compensation that may not be diminished during their continuance in office, with the evident purpose of securing them and their courts an independence of Congress and the executive. Complete independence and separation between the three branches, however, are not attained, or intended, as other provisions of the Constitution and the normal operation of government under it easily demonstrated. By affirmative action through the veto power, the executive and one more than one-third of either House may defeat all legislation. One-half of the House and two-thirds of the Senate may impeach and remove the members of the judiciary. The executive can reprieve or pardon all offenses after their commission, either before trial or during trial, or after trial, by individuals, or by classes, conditionally or absolutely, and this without modification or regulation by Congress. Ex parte Garland, 4 Wall. 333, 380, 18 L. Ed. 366, 370. ' Negatively one House of Congress can withhold all appropriations and stop the operations of government. The Senate can hold up all appointments, confirmation of which either the Constitution or a statute requires, and thus deprive the President of the necessary agents with which he is to take care that the laws be faithfully executed. These are some instances of positive and negative restraints possibly available under the Constitution to each branch of the government in defeat of the action of the other. They show that the independence of each of the other is qualified and is so subject to exception as not to constitute a broadly positive injunction or a necessarily controlling rule of construction."

From the foregoing consideration of the questions involved, we answer propositions 4, 5, and 6 in the negative.

"(7) Does section 515 of the Conservancy Act, giving priority to assessmen lien, except as to taxes, violate section 19 of article 2 of the New Mexico Constitution regarding the impairment of the obligations of contracts, or do all property owners hold in subordination to the taxing powers? Also does this section 515 of the Conservancy Act violate section 24, art. 4, of the Constitution of the state of New Mexico against special laws or is this law general and uniform in treating all persons under similar circumstances alike?"

"(9) Does section 409, subd. 5, of the Conservancy Act violate section 24 of article 4, regarding the prohibition of special laws, or does said section 409, subd. 5, regarding jury trials to fix the assessment of benefits or of damages, operate generally and uniformly as to all persons under similar circumstances, being within the district and demanding such jury trial?"

[**6, 7**] Said section 515 provides:

"The maintenance fund assessment record with the assessor constitute a perpetual lien in amount not in excess of the benefits severally appraised, upon all the lands and other property against which such assessments shall be levied, as provided in this act, to which only the lien for general or special state, county, city, town, village or school taxes shall be paramount. * * *"

The text-writers agree that it is within the province of the Legislature to enact that the lien for special assessments shall take precedence over a mortgage lien and other existing incumbrances except general taxes, since all property owners hold in subordination to the taxing power.

"A lien for public taxes and assessments is upon the property, and is paramount to all liens acquired by personal contract, when so provided by statute. * * * Although the lien of a prior recorded mortgage is superior to that of a special assessment, it is within the power of the Legislature to change the rule, and make the mortgage lien secondary to that of the assessments." Hamilton, Law of Special Assessments, § 708.

Also see Cooley, Taxation (3d Ed.) 1903, pp. 866, 868, as follows:

"Not only is it competent for the state to charge land with a lien for the taxes imposed thereupon, but the Legislature may, if it deem it proper or necessary to do so, make the lien a first claim on the property, with precedence of all other claims and liens whatsoever, whether created by judgment, mortgage, execution, or otherwise, and whether arising before or after the execution of the tax. When that is done, the lien does not stand on the same footing with an ordinary incumbrance, but attaches itself to the rest without regard to individual ownership, and, if enforced by sale of the land, the purchaser will take a valid and unimpeachable title."

The California Supreme Court said:

"Whether the power to tax for street improvements is to be referred to the general taxing power and to the power of eminent domain, or, as some courts have suggested, to the police power, is not very important. Whatever its source may be, it exists beyond question by reason of its nature and objects, and that it partakes of the nature of the taxing power to levy a tax for general purposes, which shall be a lien superior to all other liens, prior or otherwise, is not doubted, and it is not because it is called a tax, but because of its object and the necessity for raising revenue in order to execute the functions of government. In modern times, whatever may have been the demands of

society in an earlier period of the development of government, the necessity for improving the streets of cities and towns, while perhaps less important in degree than the general objects of government, is yet important and necessary to the welfare of the whole community, and in our opinion the principles on which the system of general taxation depends, and which govern in the enforcement of tax levies for general purposes, are also applicable to taxation for the improvement of streets, the construction of sewers, and other like public work." German Savings, etc., Soc. v. Ramish, 138 Cal. 120, 124, 69 P. 89,. 92.

The inherent nature of special assessments, the nature of public improvements for community advancement, the knowledge imputed to one contemplating the acceptance of the mortgage or other lien that such improvements may be ordered in, are sufficient to make his lien secondary.

As decided by the Supreme Court of Indiana in Murphy v. Beard, 138 Ind. 565, 38 N. E. 34:

"The mortgagee takes subject to the rights of the public."

Whatever the arguments or reasoning of the courts, it is generally held that it is within the legislative prerogative to enact that mortgages and other liens, either anterior or subsequent in point of time to that of the special assessment, shall be subordinated in effect to the latter. The specific attack by appellants upon this provision of the Conservancy Act is that it violates section 19 of article 2 of the New Mexico constitution regarding the impairment of the obligations of contract. This sort of an objection was answered in the case of Wabash Eastern Railway Co. of Illinois v. Commissioners of East Lake Fork Special Drainage District, 134 Ill. 384, 25 N. E. 781, 10 L. R. A. 285, the court deciding (syllabus):

"(6) The drainage law of 1885, giving a lien for assessments superior to the liens of existing incumbrances, is not unconstitutional, as impairing the obligation of contracts or divesting vested rights. Every one holds his property subject to the exercise of the taxing power, regardless of the nature of his interest—whether a fee, an estate in expectancy, an estate for years, or a mere lien.

"(7) The lien of a special assessment in a drainage district created under section 72 of the Drainage Act of 1885,

is not upon any special interest in the land, but upon the land itself; that is, upon the res. The lien so given is of the same nature, and subject to the same general rules as that given in case of general taxes.

"(8) Special assessments are a species of taxation, peculiar in their nature, and subject to special rules, but the power to levy them is referable to the taxing power.

"(9) A lien of a special assessment, like the lien for taxes, attaches to the land itself, irrespective of the interests of the various owners, and is paramount to all other claims or liens against the property."

We do not think that the portion of section 515 of the Conservancy Act heretofore quoted violates section 19 of article 2 of the New Mexico Constitution.

We do not think that said section 515, or subsection 5 of section 409, or subsection 3 of section 402, of the Conservancy Act, violates section 24 of article 4 of the Constitution of the state of New Mexico against the enactment of special laws. In the case of Thomas Davy v. T. J. McNeill et al., supra, we held that chapter 41 of the Laws of 1919, providing for the establishment of irrigation districts, was not repugnant to section 24 of article 4 of the New Mexico Constitution, and a stronger argument could be presented in favor of such objection under that law than under the Conservancy Act on account of certain "classifications" provided for in the Irrigation District Act. In that case we said:

"To be a general law, it is only necessary that the law be framed in general terms and operate on all objects of legislation distinguished by a reasonable classification. It must be general in its application to a particular class and all of the class within like circumstances. A general law is one 'framed in general terms, restricted to no locality, and operating equally upon all of a group of objects, which, having regard to the purposes of the legislation, are distinguished by characteristics sufficiently marked and important to make them a class by themselves.' Trenton Iron Co. v. Yard, 42 N. J. L. [Law] 357. 'A law is general and uniform if all persons in the same circumstances are treated alike.' Davis Coal Co. v. Polland, 158 Ind. 607, 62 N. E. 492, 92 Am. St. Rep. 319."

We hold that the Conservancy Act is a general law

within the purview of section 24 of article 4 of the New Mexico Constitution.

"(8) Does section 201 of the Conservancy Act, subsec. 1, par. (f), giving certain powers to conservancy districts, violate section 1 of article 16 of the Constitution regarding existing rights to the use of any waters in this state for any useful or beneficial purpose, unless and until such powers are exercised contrary to law, or unless and until there is a conflict with the owner of some vested right as against the powers conferred by law unon the conservancy district in the exercise of same."

[8] Appellants complain that paragraph (f) of subsection 1 of section 201 of the act, which authorizes the conservancy district to straighten, widen, deepen, divert, or change the course or terminus of any natural or artificial water course, drainage, irrigation, or community ditches or acequias, incident to protecting public and private property from inundation, violates section 1 of article 16 of the New Mexico Constitution. Said section of the Constitution is as follows:

"All existing rights to the use of any waters in this state for any useful or beneficial purpose are hereby recognized and confirmed."

The provisions of the Constitution must be construed so that they may be harmonized with each other. Section 18 of article 11 of the New Mexico Constitution is as follows:

"The right of eminent domain shall never be so abridged or construed as to prevent the Legislature from taking the property and franchises of incorporated companies and subjecting them to the public use, the same as the property of individuals."

Sections 310 and 311 of the Conservancy Act provide for condemnation of property taken for the public use, and are as follows:

"Sec. 310. (1) The district, when necessary for the purposes of this act shall have a dominant right of eminent domain over the right of eminent domain of private or public corporations.

"(2) In the exercise of this right, due care shall be taken to do no unnecessary damage to others, and, in case of failure to agree upon the mode and terms of interference, not to interfere with their operations or usefulness beyond the

actual necessities of the case, due regard being given to the other public interest involved.

"Sec. 311. The district shall also have the right, instead of having appraisals made by the appraisers, to condemn for the use of the district, according to the procedure provided by chapter XXXIV of the Codification of 1915, and all amendatory or supplementary acts, for the appropriation of land or other property taken for public use; any land or property within or without said district not acquired or condemned by the court on the report of the appraisers."

The taking of property under the procedure authorized in paragraph (f) of subsection 1 of section 201 of the act, if taken in accordance with the provision of the laws governing the taking of property for public use, would not violate section 1 of article 16 of the New Mexico Constitution.

"(10) Is subdivision 3, § 402, art. 4, of the Conservancy Act in violation of section 24, art. 4, of the Constitution of the state of New Mexico relating to local special laws, or section 3, art. 8, of the Constitution of the state of New Mexico, providing tax exemption to the state of New Mexico and all counties, towns, cities and school districts and other municipal corporations, etc., unless and until attempt is made to enforce the collection of said assessments against the state of New Mexico or other public corporations affected?"

[9] This court declared, in Lake Arthur Drainage District v. Field, supra, that specific assessments on property for improvements, based on benefits, the cost of which is assessed against the property, is not a tax within the inhibition of section 3 of article 8 of the Constitution of New Mexico. Furthermore, subsection 2 of section 103 of the act defines "public corporations" to mean:

"* * * Counties, towns, villages, cities; community land grants; community ditches or acequias, water users' association; school, drainage, irrigation, water, park, improvement or conservancy districts; and all governmental agencies clothed with the power of levying or providing for the levy of general or special taxes, or special assessments."

Sections 512 and 513 of the act declare a means of providing for the payment of the benefits and damages which may be appraised as accruing to "public corporations" independently of a recourse to enforce-

ment of liens upon the property owned by said public corporations.

Regarding a similar situation in the state of Colorado under the Conservancy Act, the Colorado Supreme Court, in People v. Lee, supra, said:

"In 19 C. J. 718, it is said that an assessment for the construction or improvement of a drain may be made against counties, townships, or municipal corporations. That an assessment for special benefits, to pay for a public improvement, may be levied against a county by the city constructing such improvement, was held in County Commissioners v. City of Colorado Springs, 66 Colo. 111, 180 P. 301. Under the authorities above cited, we hold that there is no violation of section 8, art. 11, of the Constitution of Colorado, in the act in question."

In the case of County of El Paso v. City of Colorado Springs, 66 Colo. 111, at page 116, 180 P. 301, 303, the court says:

"One theory upon which public property is exempted from general taxation is that it is idle for the public to tax itself for the purpose of paying money to itself. This argument obviously does not apply to special assessments for segregated improvement districts, still less to the case of county property in a small improvement district. This court has held that the exemption from taxation expressed in the Colorado Constitution does not apply to special assessments. Denver v. Knowles, 17 Colo. 204, 30 P. 1041, 17 L. R. A. 135. And it would therefore seem inconsistent to say that they could not be enforced against the country. If it be claimed that the law furnishes no remedy, the answer is that the law always provides a remedy to enforce any right. The proposition that any right can fail for lack of a remedy is obsolete. The argument that the county's property is not subject to assessment because it cannot be sold for the same is answered by the proposition that it is not going to be sold. The justice of the payment has been recognized by Colorado, who by reason of her sovereignty could not be compelled to pay assessments, yet voluntarily passed an act to do so, S. L. 1917, 110."

"(12) Do the powers of assessment conferred by the Conservancy Act violate section 1 of article 8 of the Constitution of the state of New Mexico, providing that 'taxes levied upon tangible property shall be equal and uniform upon all subjects of taxation of the same class,' or do the 'special benefits' to be conferred upon lands within the conservancy district constitute what is known in the law as an 'assessment' not within the operation of the constitutional provisions which apply to general taxation because apportioned

according to benefits on reasonable basis fixed by the Legislature?"

What we have heretofore said relative to the distinction between general taxes and special taxes or assessments according to benefits is sufficient to answer this query in the negative.

"(13) Does the Legislature of the state of New Mexico have power to confer jurisdiction of special cases and proceedings on a district court, even though the same affects lands lying within other judicial districts?"

[**10**]  The only attack made on subsection 5 of section 409 of the act is that the provision thereof that condemnation proceedings "shall be had in the court in which the original case is pending" is contrary to section 24 of article 4 of the Constitution of New Mexico, inhibiting the passing of local or special laws in certain cases and specifically in "the change of venue in civil and crimnial cases." The argument is that the Legislature has no power to confer jurisdiction upon the district court to try condemnation cases involving land lying in another district. As we have said, the provisions of the Conservancy Act are general in their nature and not repugnant to the provisions of section 24 of article 4 of the Constitution.

No other section of the Constitution has been pointed out that would deprive the Legislature of the right to extend the jurisdiction of the district court to cases involving land lying wholly or in part beyond the judicial district of the court trying the case. We look to the state Constitution, not alone for authority for a legislative act, but for limitations of authority. As was said in the case of Alexander v. People, 7 Colo. 155, 2 P. 894:

"The Legislature being invested with complete power for all the purposes of civil government, and the state Constitution being merely a limitation upon that power, we look into it, not to see if the enactment in question is authorized, but only to see if it is prohibited."

Section 13 of article 6 of the Constitution provides:

"The district court shall have original jurisdiction in all

matters and causes not excepted in this Constitution, and such jurisdiction of special cases and proceedings as may be conferred by law."

It has long been a custom to grant jurisdiction to district courts in partition proceedings, mortgage foreclosure proceedings, and other cases involving interest in lands in the county where the land or any portion thereof is situate. The fourth paragraph of section 5567 of the Code reads as follows:

"When lands or any interests in lands are the object of any suit in whole or in part, such suit shall be brought in the county where the land or any portion thereof is situate."

In Miami County v. Dayton, supra, the court said:

"Both state and federal courts are uniform in their holding that, before a legislative act can be declared unconstitutional, it must be clearly in conflict with some provision of the Constitution. It will not do to hold that the act is unconstitutional because it is contrary to the general spirit pervading the Constitution, but the conflict must be between the act and some specific provision, either in express words or by clear implication. * * * In order then that the conservancy statute, or any part thereof, shall be held unconstitutional, it must appear that the statute permits something which the Constitution prohibits, or prohibits something which the Constitution permits, and that this conflict must be so clear that it is beyond reasonable doubt. In construing a Constitution, we apply the same general rules that we do in statutes, save and except that the terms of a Constitution must of necessity be of a more general and ominous character, and, therefore, in order that the grants of power under a Constitution shall be workable, such grants should be favorably and liberally construed so as to effect the public welfare sought by the constitutional grant."

We hold that the provisions of subsection 5 of section 409 of the act do not violate the Constitution.

"(14) Does section 502, authorizing preliminary fund assessment, constitute a delegation of legislative authority or violate section 1 of article 8 of the Constitution of the state of New Mexico regarding taxation, because said assessment is made on an area basis rather than on the ad valorem basis, and should such preliminary fund assessment be sustained on the ground of special benefits to be conferred on lands within the conservancy district, apportioned on the area basis, and therefore not within the operation of the constitutional provisions applying to general taxation?"

[11]   A similar question under a Conservancy Act was before the Supreme Court of Ohio in Miami County v. Dayton, supra, and the court said:

Having, however, already found that this is a special and local tax in the nature of an assessment, we approve the reasoning found in the federal case of County of Mobile v. Kimball, 102 U. S. 691 [26 L. Ed. 238]. In that case the state of Alabama had provided for the improvement of Mobile harbor and had provided for the payment by a levy upon the property of the county of Mobile. Objection was taken that this was either a local improvement for the city of Mobile alone, or else it was a state improvement. In either event the county of Mobile should not be taxed for the cost of the cost of the improvement. Mr. Justice Field, on page 703 uses this language: 'Here the objection urged is that it fastens upon one county the expense of an improvement for the benefit of the whole state. Assuming this to be so, it is not an objection which destroys its validity. When any public work is authorized, it rests with the Legislature, unless restrained by constitutional provisions, to determine in what manner the means to defray its cost shall be raised. It may apportion the burden ratably among all the counties, or other particular subdivisions of the state, or lay the greater share of the whole upon that county or portion of the state specially and immediately benefited by the expenditure.'

"But a case more in point, indeed on practically all fours with the case at bar, is the recent case of Houck v. Little River Drainage District, 248 Mo. 373 [154 S. W. 739], affirmed, 239 U. S. 254 [36 S. Ct. 58, 60 L. Ed. 266]. In the Missouri case, as in the case at bar, a corporation was created for the purpose of reclaiming or improving swamp or overflowed lands. The corporation was vested with power and authority to construct and maintain whatever works were necessary to accomplish the object and to raise the funds to pay for the same by assessment on the lands to be benefited thereby. The Missouri statute contained this provision: 'As soon as any drainage district shall have been organized under order of the circuit court, and a board of supervisors are elected and qualified, such board of supervisors shall have the power and authority to levy upon each acre of land in the district, not to exceed twenty-five cents per acre, as a level rate, to be used for purpose of paying expenses of organization, for topographical and other surveys, for plans of drainage, for expense of assessing benefits,' etc., 'before entering upon the main work of drainage.'

"The Supreme Court of Missouri held that that section was constitutional as against the contention of 'due process of law' and 'equal protection of the laws' provided by the federal Constitution. They also found that it was no viola-

tion of the Missouri Constitution, which, so far as the mat-
ters are involved, is not unlike the Contitution of Ohio.
This Missouri case is rich in its reason, and apparently cover
the whole doctrine of police power exercisable by the state
in its relation to the creation of districts for drainage or
conservation purposes. Special attention is here noted to the
language of the Supreme Court of Missouri touching this
statute.    The court say, touching the flat rate of 25 cents
per acre upon all lands within the district for preliminary
survey, plans of drainage, etc., before entering upon the
main work of drainage: 'The section is constitutional. If it
be objected that no judicial finding of benefits is required, it
will be answered that the Legislature has seen fit to intrust
to the judicial department the establishment and territorial
limitation of the benefit district in a proceeding in which
the question whether or not each tract included will be bene-
fited is directly involved. Having expressed its will as to the
principles which should govern the distribution of these taxes
upon the land so found to be benefted the Legislature has
left the necessary amount of the assessments to be ascer-
tained by the authorities of the district, as it leaves like
questions of municipal taxation to its municpal agencies."

"Again, the court further says in its syllabus: 'Again, if
it be objected that it might be developed by the work, and
therefore it must be assumed to have been contemplated by
the law, that there will be no resulting increment, which,
under the name of benefits, constitutes the only constitu-
tional support for this class of taxation, it will be answered
that, when the organization of a drainage district has reached
the stage where the tax in question may be levied, the situ-
ation is: The Legislature has designed an important public
work, and has found that its accomplishment will result
in such benefit to the lands included in its scope as to justify
the assessment of the entire cost as a special tax against
them.    The power to tax necessarily includes the power to
raise the money in such time and manner as is necessary
to accomplish the purpose for which the tax is levied.' "

And, again, that court said:

"The 'due process' clause has been much abused and
stretched to limits never designed by the Constitution mak-
ers. But it must be observed that it is not the deprivation of
property that is prohibited by this amendment, but the depri-
vation of property without due process of law."

In Davy v. McNeill, supra, following City of Roswell
v. Bateman, 20 N. M. 77, 146 P. 950, L. R. A. 1917D,
365, Ann. Cas. 1918D 426 we upheld the front foot rule
of assessments which is the same in effect as the area
rule and we also therein decided that as the assess-
ment liens upon the property if unpaid, could only be
foreclosed by a suit in which the property owner is

given an opportunity after notice, for hearing, by way of defense of his grievances before his property could be irrevocably charged with the lien of the special taxes or assessments, or such lien foreclosed, due process of law is not offended. So it is as to the preliminary fund assessment in this case. ·

"(15) Is the subject of the Conservancy Act clearly stated in the title as contemplated by the Constitution? (Conservation is defined by Webster, 1919 Edition, p. 478, as 'a conserving, preserving, guarding or protecting; a keeping in a safe or entire state; preservation; also official care or keeping and supervision, as of a river. * *' Conservancy, the noun, defined as official conservation as of rivers, etc., from injury, defilement or irregular use, or of public health."

[12] The act is not attacked on the ground that the title renders the act unconstitutional. Appellants freely admit that no such contention was made in the court below, and it not argued in the briefs. Appellants do, however, argue, that the title to the act indicates that the Legislature had in mind different purposes from those declared in the Ohio and Colorado Conservancy Acts. They argue that, because the title of the act embraces the subject of co-operation with the federal government in its reclamation policy, the indications are that the purposes of our Conservancy Act look to the improvement of the agricultural conditions of the Rio Grande Valley, and that alone.

In getting at the intent of the ·Legislature we are not limited to an examination of the subjects expressed in the title. We may examine the act itself. Counsel for appellants says in his reply brief:

"Hence, the Colorado law as well as the Ohio law are measures adopted by those states strictly within the police power of the state, solely and exclusively for the protection of life and property, and not in any sense calculated to interfere with the industrial pursuits of their people. That object plainly appears in the statement of the objects and purposes for which the act was passed, which are as follows, to-wit: (a) preventing floods; (b) regulating stream channels by changing, widening and deepening same; (c) regulating the flow of streams; (d) diverting and controlling, or in whole or in part eliminating water courses; (e) protecting public and private property from inundation."

Counsel has apparently copied from section 2 of the Colorado act. Section 2 of the Ohio act is substantially the same as that of Colorado, but the Ohio act contains one additional purpose, to-wit: "Of reclaiming or of filling wet and overflowed lands." An examination of subsection 1 of section 201 of the New Mexico Conservancy Act shows that the Legislature used this portion of the Ohio act as its model, because paragraph (e) thereof is substantially the same as paragraph (c) of section 2 of the Ohio act, heretofore quoted. It would not appear that the Legislature, at its session in 1923, in the passing of chapter 140, known as the Conservancy Act, had in mind alone or principally the reclamation of lands, because there were already statutes existing authorizing the formation of drainage districts and also of irrigation districts, under which several large irrigation and drainage projects have been previously organized. These acts were not in any way expressly amended or repealed. In fact, chapters 41 and 20 of the Session Laws of 1919 dealing with irrigation districts were recognized by chapter 107, Session Laws of 1923, approved the same day as the Conservancy Act; both of these acts becoming effective at the same time. Said chapter 20 of the Session Laws of 1919 was "An act relating to irrigation districts organized or to be organized for the purpose of cooperating with the government of the United States under the terms of the federal reclamation law and other federal laws, and repealing existing laws in conflict herewith." This is a comprehensive act, and, so far as reclamation through co-operation with the United States is concerned, seems to be ample.

As we have said, the provisions of the New Mexico Conservancy Act are essentially the same as the Conservancy Acts of Colorado and Ohio. What may have been the impending dangers to the public safety, health, and welfare of the inhabitants of the state of New Mexico to call forth the passage of the act is not before us and is unimportant. The wisdom and necessity for such legislation is within the province of the

Legislature, and the act should not be declared unconstitutional unless it is clearly so. We are enlightened and admonished by section 906 of the act:

"This act being necessary to secure and preserve the public health, safety convenience and welfare, and being necessary for the prevention of great loss of life, and for the security of public and private property from floods and other uncontrolled waters, it shall be liberally construed to effect the purposes of this act."

Before a Conservancy district may be establised, there must be an adjudication upon the matters set forth in the petition. The petition must set forth among other things that the property within the proposed district will be benefited by the accomplishment of one or more of the purposes enumerated in section 201, which are substantially as quoted above from appellant's brief. The agreed statement of facts states that:

"Said petition was in all things drawn up in conformity with the requirements of law, and was legally sufficient for the purpose it sought to accomplish. * * That proper and sufficient notices of the pendency of said petition for the establishment of the conservancy district were duly published in the English and Spanish languages in the manner and for the time required by law."

By section 205 any property owner or any public corporation not having signed the petition has the right to a hearing on the truth of the matters set forth in the petition.

In this case the court found, after the taking of testimony, **the examination of exhibits,** and the argument of counsel, that the allegations of the petition, amended petitions and additional petitions in support thereof were true, and—

"That the public safety, health, convenience and welfare will be promoted by the organization of the conservancy district substantially as prayed in said petition, amended petition, and additional petitions in support thereof, and that a public necessity exists for the construction of the proposed work."

These findings are not excepted to or assailed by the appellants. The proceedings in the district court were

not assailed, except as to the admission of the certificates of the county treasurers in evidence; the objections otherwise being to the act of the Legislature.

If an attempt should hereafter fraudulently be made to accomplish a purpose not within the purview of this act, the courts would doubtless give protection to the complaining parties. But, as seen by the court's findings, such is not the case here.

As we pointed out, in State v. State Investment Co., 239 P. 741, the fact that a law may offer opportunity for abuses in the manner of its applicatioin is no objeciton to the law itself from the standpoint of its constitutionality.

It follows from all of the foregoing that the judgment of the district court was correct, and should be affirmed, and it is so ordered.

PARKER, C. J., and WATSON, J., concur.